CRIMPERS PROMOTIONS,
INC., Plaintiff,

v.

HOME BOX OFFICE, INC. and Showtime Entertainment Corporation,
Defendants.

No. 81 Civ. 7325 (LBS).

United States District Court,
S.D. New York.

Dec. 30, 1982.

Jerry I. Lefkowitz, Forest Hills, N.Y., for plaintiff.

Cravath, Swaine & Moore, New York City, for defendant Home Box Office Inc.; Robert D. Joffe, New York City, of counsel.

Hughes, Hubbard & Reed, New York City, for defendant Showtime Entertainment Corp.; John Donovan, New York City, of counsel.

## OPINION

SAND, District Judge.

Defendants Home Box Office Inc. ("HBO") and Showtime Entertainment Corporation ("Showtime") move to dismiss the claims of plaintiff Crimpers Promotions Inc. ("Crimpers") pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Crimpers alleges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, as well as a number of violations of New York tort and unfair competition law. We find that plaintiff's complaint states a valid cause of action for conspiracy to restrain trade and attempted monopolization under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and therefore deny defendants' motion with respect to Counts I and II of the complaint. We find, however, that plaintiff fails to plead adequately a tying claim under Section 1 of the Sherman Act and Section 3 of the Clayton Act and therefore grant defendants' motion with respect to this claim without prejudice to the filing of an amended complaint. With respect to the state claims, we find that plaintiff has stated valid causes of action for tortious interference with prospective business advantage and contractual relations. We dismiss plaintiff's unfair competition and prima facie tort claims.

## FACTS

Plaintiff is a New York corporation organized in 1980 for the initial purpose of producing, managing and operating a cable television trade show known as Catel Expo-Programming Sources '81 ("Catel") that was to take place in Las Vegas, Nevada in September, 1981. The purpose of the Catel show, as set forth in plaintiff's complaint, was to provide a forum in which independent producers and suppliers of cable television programming could meet and transact business with prospective purchasers of such programming, such as cable television networks.[1]

---

1. Plaintiff defines programming as "anything a system operator sends out over his or her wire

including, but not limited to movies, sports and other entertainment organized in a complete

The defendants, HBO and Showtime, are two of the leading companies in the cable television industry. Both HBO and Showtime purchase programming from independent producers and suppliers and package this programming into a complete network format for sale to cable system operators. The cable operators, in turn, transmit the HBO and Showtime network programming to their home television subscribers. (HBO and Showtime also produce some of their own programming.) Plaintiff alleges that HBO and Showtime are the dominant forces in the cable pay-television industry, with thousands of affiliate networks and over ten million subscribers throughout the United States. Complaint ¶¶ 7(c)–(f); 8(c)–(e); 9(c).

The essence of plaintiff's complaint is that HBO and Showtime have monopolized or attempted to monopolize the cable television industry, and have used this monopoly power to cause plaintiff's trade show to be a financial failure. The complaint alleges that HBO and Showtime conspired to boycott plaintiff's trade show, and exerted their monopoly power in the cable industry to coerce other independent programmers, suppliers, and potential purchasers of programming to do likewise.[2] According to Crimpers, HBO and Showtime boycotted and attempted to ruin the Catel show for fear that its success would provide a forum in which independent buyers and sellers of cable programming could transact business face-to-face, reducing or eliminating much of defendants' economic power in the cable industry. HBO and Showtime are alleged to act as middlemen in the cable industry, purchasing large amounts of programming from independent producers at artificially low prices, arranging the programming into a network format, and then reselling it as a package to cable networks for transmission to subscribers. Plaintiff alleges that independent buyers and sellers of programming are kept from trading on a "stand-alone" basis (see fn. 1, *supra*) because of defendants' power as middlemen. Complaint ¶¶ 9(d); 19; 24(g).

More specifically, plaintiff alleges that HBO and Showtime, after expressing initial interest in the Catel show, decided to withdraw from participation. According to the complaint, the defendants informed independent suppliers and systems operators that plaintiff's show was a "rip-off" and a "fraud on the public," and that they should not attend. More importantly for our purposes, Crimpers alleges that the defendants conspired together and exerted their individual monopoly power to coerce independent suppliers of programming not to appear at Catel by threatening that were they to do so, defendants would no longer purchase their programming. Complaint ¶¶ 13, 14, 19–22.

Plaintiff contends that, as a result of these actions, defendants have reduced competition in the markets for the sale and purchase of programming for cable television, and have prevented independent producers and suppliers from transacting business with potential purchasers on a stand-alone basis at trade shows like the one organized by the plaintiff. Prior to defendants' alleged conspiracy, Crimpers anticipated that more than 250 companies would participate in its trade show. Plaintiff contends that as a result of defendants' ac-

network format or offered on a stand-alone basis: news, weather and business information; educational courses, home security, transactional and other interactive programming services." Complaint ¶ 6(d). "Stand-alone" programming refers to the practice whereby a cable operator acquires programming directly from a producer or supplier and schedules it for transmission to subscribers.

2. To the extent that plaintiff is alleging that defendants as a group attempted to or have monopolized the cable industry, this is a claim of oligopoly, and is not cognizable under Section 2 of the Sherman Act. *American Telephone and Telegraph Co. v. Delta Communications Corp.*, 408 F.Supp. 1075, 1106 (S.D.Miss. 1976), *aff'd per curiam*, 579 F.2d 972 (5th Cir. 1978), *cert. denied sub nom. Delta Communications Corp. v. National Broadcasting Co.*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). We read plaintiff's complaint, however, as alleging: (1) conspiracy to restrain trade on the part of HBO and Showtime together; and (2) attempted monopolization or monopolization on the part of each defendant separately.

tions, only 200 people attended and only 55 companies participated, occupying fewer than one hundred booths. Plaintiff was unable to obtain sufficient exhibitors and attendees for its trade show, continues to be unable to do so, and has been forced to cease business. Plaintiff seeks injunctive relief and treble damages.

### STANDING

Defendants argue that, even if we assume plaintiff's allegations to be true as we must on this motion to dismiss, Crimpers is not a proper party to bring these antitrust claims because it lacks standing. To sue under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act plaintiff must meet the requirements of Section 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" shall have a cause of action for treble damages. Despite this sweeping language, the courts have been unwilling to grant relief to all plaintiffs alleging injury resulting from an antitrust violation. Rather, the courts have grafted a doctrine of standing onto the statute that requires that the defendant's violations have been the proximate or legal cause of plaintiff's injury.

■ Although the language employed to describe the standing requirement differs among the Courts of Appeals, compare, e.g., Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir.1971) ("target area" test), with Bravman v. Bassett Furniture Industries, Inc., 552 F.2d 90 (3d Cir.1977) ("totality of the facts" test), and remains somewhat in flux, see generally Berger & Bernstein, An Analytic Framework for Antitrust Standing, 86 Yale L.J. 809 (1977), the Second Circuit utilizes the so-called "target area" test. Under this test, the plaintiff must either be the "direct target" of the antitrust violation or fall within the "target area" of the alleged antitrust violation—that sector of the economy which is endangered by a breakdown of competitive conditions in the particular industry. Calderone Enterprises

Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir.1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir.1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). That is, the causal connection between the plaintiff and the alleged antitrust violation must be such as to "link a specific form of illegal act to a plaintiff engaged in the sort of legitimate activities which the prohibition of this type of violation was clearly intended to protect." Billy Baxter, 431 F.2d at 187. Defendants rely on the leading cases of Calderone, supra, and Billy Baxter, supra, to support their argument that Crimpers was neither the "direct target" nor within the "target area" of the alleged conspiracy.

The plaintiff in Billy Baxter was the franchisor of a line of carbonated beverages marketed under the "Billy Baxter" trademark. Plaintiff also licensed information and supplied ingredients necessary for the manufacture of Billy Baxter beverages, but was not involved in its actual production or distribution. Billy Baxter sued Coca-Cola and Canada Dry, alleging that they had restrained competition in the "nonalcoholic carbonated beverage industry" in violation of the antitrust laws by inducing beverage retailers and distributors to cease purchasing Billy Baxter products from plaintiff's franchised bottlers. 431 F.2d at 184–87. The Second Circuit held that plaintiff was without standing to bring its Sherman Act claim because it was neither the direct target nor within the target area of the violation. Plaintiff did not engage in or compete with the defendants in the marketing of carbonated beverages, and therefore was not within that sector of the economy threatened by the breakdown in competition—the so-called target area. Moreover, the harm plaintiff incurred was indirect and incidental—a reduction in franchise royalties due to its franchisee's decreased sales. Plaintiff was not the direct target of the defendants' alleged violation. The court concluded that "[a]n interference with the marketing of beverages may interrupt

profitable relationships and thereby harm a party which in effect 'markets' franchises and ingredients, but the connection is not sufficiently compelling to support a treble damage suit." *Id.* at 189.

The Second Circuit employed a similar analysis in *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). In that case, the plaintiff leased motion picture theatres to exhibitors in return for a fixed rent plus a percentage of the gross receipts from the exhibition of movies. Plaintiff alleged that the defendant motion picture exhibitors and distributors had engaged in a conspiracy to reduce competition by agreeing to divide local movie theatres into separate "tracks", and then allocating first-run movies among these tracks, thereby eliminating competition among theatres. Were it not for this conspiracy, the plaintiff argued, the theatres it owned would book a larger number of first-run movies and its rent, based on a percentage of gross receipts of its lessee, would have increased. In denying standing to the plaintiff, the court observed:

"In a series of decisions over the last 15 years, in all of which certiorari was denied by the Supreme Court, this court has committed itself to the principle that in order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i.e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' or with partici-

pants in an alleged antitrust conspiracy, rather than by being 'targets' themselves."

454 F.2d at 1295. The conspiracy alleged in *Calderone* was aimed at competing movie distributors and exhibitors, not at the plaintiff theatre owner. Plaintiff was not, therefore, within the relevant "target area." Those who competed with the defendants in the exhibition and distribution of movies had standing to bring suit for the alleged conspiracy, not the plaintiff. *Id.* at 1296–97.

HBO and Showtime argue that Crimpers is in the same derivative position with respect to the defendants' alleged activities as the plaintiffs in *Billy Baxter* and *Calderone.* First, they note that Crimpers does not directly compete with defendants in the buying and selling of cable programming. The defendants view their alleged actions as aimed at other competitors and not at Crimpers, which is solely in the trade show business.[3] The fact that Crimpers might have incurred significant harm as a result of their alleged unlawful business behavior does not, according to the defendants, place the plaintiff within the target area of that behavior; they suggest that only those entities that directly compete in these markets would have standing to bring suit. Defendants' Memorandum in Support of Their Motion to Dismiss ("Defendants' Memorandum"), at 14–15. Nor does the fact that Crimpers may have incurred significant harm transform it into a direct target of defendants' alleged conspiracy. Rather, plaintiff is simply an incidental victim, harmed only as a result of its relationship with the direct targets of the conspiracy, defendants' competitors. Because plaintiff is only incidentally harmed, it is no more

3. In an affidavit submitted to the Court along with its reply brief, plaintiff attempts to establish facts that would qualify it as a direct competitor of HBO and Showtime in the purchase and sale of cable programming. Plaintiff suggests that an amendment of its complaint to include such facts would cure any standing problems. Even if we were to consider plaintiff's affidavit on this 12(b)(6) motion to dismiss, we find plaintiff's participation in the buying and selling of programming to be de

minimus. Moreover, the injuries for which plaintiff seeks damages occurred in its role as a trade show operator, not as a potential lessee of a trade show booth. For these reasons, we do not consider plaintiff a direct competitor with defendants in the purchase and sale of cable programming for purposes of this motion and any amendment of the Complaint to such effect would fail to cure plaintiff's standing problems in this regard.

844

entitled to standing under the antitrust laws than is the theatre lessor in *Calderone,* the franchisor in *Billy Baxter,* or any other supplier, creditor or employee whose profits rise and fall with the fortunes of a direct target of an alleged antitrust conspiracy.

Furthermore, even if Crimpers was a direct target of the alleged conspiracy, defendants contend it would still lack standing because it was outside the target area and did not incur direct injury. Defendants' Memorandum, at 14–15 and n. *; *see Reading Industries, Inc. v. Kennecott Copper Corp.,* 477 F.Supp. 1150, 1160 (S.D.N.Y. 1979), *aff'd,* 631 F.2d 10 (2d Cir.1980), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). Defendants contend that plaintiff's injuries can only be determined through a "tenuous and tortured line of reasoning." Defendants' Memorandum, at 17.

Finally, defendants contend that the alleged destruction of plaintiff's trade show was simply a *means* to their ultimate goal of restraining trade in the cable television industry. According to defendants, parties that are adversely affected by the means of achieving an anticompetitive goal but that are not directly affected once the goal is reached are without standing because their injury is "incidental to the accomplishment of the illegal object." Defendants' Memorandum at 23 (citing *Conference of Studio Unions v. Loew's,* 193 F.2d 51, 54 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952)).

Despite defendants' arguments, we do not think *Billy Baxter* and *Calderone* compel the dismissal on the grounds of standing of Crimpers' Section 1 conspiracy claim or its Section 2 attempted monopolization claim. Defendants' characterization of plaintiff as outside the "target area" of the alleged violation, and their labelling of plaintiff's alleged injury as "incidental" rather than "direct" provides no "talismanic guide[ ] to decision," for these terms only indicate "the need to examine the form of violation alleged and the nature of its effect on a plaintiff's own business activities." *Billy Baxter,* 431 F.2d at 187; *see Reading*

*Industries, Inc. v. Kennecott Copper Corp.,* 631 F.2d at 12. When we focus on the specific contents of plaintiff's allegations, and the relation of its alleged injuries to the defendants' actions, we find this case to be more problematic than either *Billy Baxter* or *Calderone.* In *Billy Baxter,* the plaintiff was two steps removed from the alleged boycott. The defendants in that case allegedly coerced retailers into refusing to buy Billy Baxter beverages from wholesale bottlers and manufacturers. As the wholesalers' profits declined, so did the profits of the plaintiff franchisor. In the instant case, the intermediate actor (the wholesaler) is missing. The allegation is that the defendants conspired together to boycott plaintiff's trade show directly and used coercive tactics to force their suppliers and competitors to follow suit. By contrast to the situation in *Billy Baxter,* the plaintiff's alleged injuries in this case are not merely derivative of a boycott taking place at another level of production.

█ *Calderone* is also distinguishable. In that case, there was no evidence that the alleged conspiracy was in any sense directed at the particular plaintiff. The plaintiff was just one of any number of actors that arguably were harmed by the defendants' alleged actions. The defendants in this case, by contrast, took "direct aim" at Crimpers and its trade show. Where a defendant aims its conspiracy at a clearly identifiable target, that target is sufficiently connected to the defendant's allegedly unlawful behavior so as to have standing under Section 4 of the Clayton Act. *See Calderone,* 454 F.2d at 1296 n. 3 ("If Calderone had alleged ... that the defendants had aimed their conspiracy at it ... Calderone would be in a different posture.").

Whatever doubts we might have entertained with respect to the validity of plaintiff's claim under *Billy Baxter* and *Calderone* were dispelled by the Supreme Court's decision last term in *Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). The plaintiff in that action brought suit under the antitrust laws alleging that Blue Shield and the state

psychiatric society had engaged in an unlawful conspiracy to exclude psychologists from receiving compensation under Blue Shield's health benefits plan. Under its plan, Blue Shield reimbursed subscribers for part of the cost of outpatient treatment for mental and nervous disorders, including psychotherapy. However, Blue Shield only reimbursed subscribers for treatment by psychiatrists; the plan did not reimburse for services provided by psychologists unless treatments were under the supervision of a physician. The district court granted defendants' motion to dismiss, ruling that the plaintiff, a subscriber under the plan, stood outside the "target area" of the alleged conspiracy and was therefore without standing to sue. The Fourth Circuit reversed, 649 F.2d 228 (4th Cir.1981), and the Supreme Court affirmed.

In granting the plaintiff standing to sue under Section 4 of the Clayton Act, the Court began by noting that the availability of the antitrust remedy was not a question of the specific intent of the conspirators. —— U.S. at ——, 102 S.Ct. at 2548–49. The Court than proceeded to analyze McCready's claim:

> McCready claims that she has been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers. Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready . . . was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely " 'the type of loss that the claimed violations . . . would be likely to cause.' "

*Id.* (citations omitted).

■ Although the Court explicitly declined to evaluate the utility of the target area test, *id.* at —— n. 12, 102 S.Ct. at 2547 n. 12, *McCready* nevertheless adds a signifi-

cant gloss to the line of Second Circuit cases interpreting its application, and appears to signal a rather broader reading of the standing requirement under Section 4 of the Clayton Act. At a minimum, it now seems clear that, as a rule, a plaintiff need not be a direct competitor in the market in which defendants operate, *see Aurora Enterprises, Inc. v. National Broadcasting Co.,* 688 F.2d 689, 692–93 (9th Cir.1982), as a number of Second Circuit cases seem to suggest, *see, e.g., Western Geophysical Co. v. Bolt Associates, Inc.,* 584 F.2d 1164, 1175 (2d Cir.1978). The fact that Crimpers does not directly compete with the defendants in the purchase and sale of cable programming is therefore not dispositive: McCready herself did not compete with the psychiatrists alleged to have conspired with Blue Cross to restrain trade in the psychotherapy market. Nor can our decision turn on the fact that the destruction of plaintiff's trade show was arguably only a means by which defendants sought to restrain trade. It was never suggested in *McCready* that the refusal to reimburse subscribers for psychology services was any more than a mere means to further the defendants' goal of reducing competition in the market for psychotherapy services. As for the defendants' assertion that plaintiff's damages are speculative and derivative in nature, it seems clear that the alleged injuries to Crimpers are arguably far more direct and easier to ascertain than those incurred by any one of defendants' direct competitors. Were plaintiff to show, for example, that as a result of defendants' actions, certain specific companies that had intended to attend plaintiff's trade show decided instead to boycott it, the calculation of damages would be a relatively simple matter. By contrast, one of defendants' direct competitors in the purchase of cable programming (who, according to defendants, would have standing to sue) would have a more difficult time quantifying the harm it incurred on account of an overall reduction in competition. This is not a case like *Calderone, supra,* in which a remotely situated person suffers damages that are much more speculative and difficult to prove than that of a competitor who

is an immediate victim of the violation. *See Calderone,* 454 F.2d at 1295. It is Crimpers' damages, not those of defendants' direct competitors, that are direct and quantifiable in this case.

■ *McCready* supports this analysis. In that case, psychologists were paid directly by the Blue Cross subscribers who sought their services. Thus, the harm inflicted upon them by defendants' alleged conspiracy was of an indirect nature—the potential business they lost due to the fact that subscribers who sought their services would not be reimbursed by Blue Cross. "But for" defendants' conspiracy, more subscribers might have chosen psychologists over psychiatrists and, as a result, the psychologists might have received more business. McCready, by contrast, was directly injured, in that she was not reimbursed for the psychologist's bills she had already paid. Like McCready, Crimpers bears the immediate and direct impact of defendants' alleged boycott. Defendants' direct competitors suffer indirectly by a reduction in competition. If defendants' competitors would have standing on the basis of these rather indirect and difficult to ascertain injuries, as defendants suggest, then surely Crimpers has standing.[4]

Defendants contend nevertheless that *McCready,* decided subsequent to the mak-

ing of this motion, supports their position that Crimpers is without standing. They argue that defendants' goals regarding the cable industry "could have been served only in the most indirect and remote way" by their alleged boycott of Crimpers' trade show. And it would be misconstruing the facts, according to defendants, to describe the alleged boycott and conspiracy as "inextricably intertwined" with the defendants' alleged goal—the restraint of trade in the buying and selling of cable television programming.

We find defendants' arguments unpersuasive. Crimpers is only slightly more remote a plaintiff for purposes of its Section 1 and 2 claims than the plaintiff in *McCready.* The alleged goal of defendants' conspiracy in this case was to keep buyers and sellers of cable programming from transacting business face-to-face. In furtherance of this goal, defendants are alleged to have conspired to boycott this specific trade show and to have coerced their competitors and suppliers into doing the same. Under these facts, Crimpers was no mere supplier or customer, tangentially related to the goal of the conspiracy. As in *McCready,* the boycotting and intended destruction of plaintiff's trade show was one of the clearest and most direct means by which to achieve defendants' alleged goal of restraining trade in the buying and selling

---

4. Justice Brennan posed the following hypothetical in his opinion for the Court in *McCready:*

> If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions. And plainly, in evaluating the reasonableness under the antitrust laws of the psychiatrists' conduct, we would be concerned with its effects not only on the business of banking, but also on the business of the psychologists against whom that secondary boycott was directed.... Because McCready is a consumer, rather than some other type of market participant, the dissent finds itself unwilling to acknowledge that she might have suffered a form of injury of significance under the antitrust laws. But under the circumstances of this case, McCready's participation in the market for psychotherapeutic services provides precisely that significance.

—— U.S. at —— n. 21, 102 S.Ct. at 2551 n. 21. We find Crimpers to be in a situation not unlike that of the bank and McCready. While Crimpers does not compete directly with the defendants, and while competition in the market for trade shows is minimally affected by defendants' actions, Crimpers nevertheless is directly harmed by defendants' alleged attempted monopolization, conspiracy and boycott; and its intimate connection to the market for the buying and selling of cable programming makes its injury peculiarly significant in light of defendants' alleged goal of restraining trade in this market. Crimpers is no mere supplier or creditor, with the cable industry serving as only one of a number of its customers. Rather, given its stated purpose, it is inextricably connected to the industry, its entire existence depending on the competitive health of the market for the buying and selling of programming among independent dealers.

of cable programming on a stand-alone basis. In accord with *McCready*, we find that Crimpers is " 'within that area of the economy ... endangered by [a] breakdown of competitive conditions' " resulting from defendants' alleged boycott. *McCready*, —— U.S. at ——, 102 S.Ct. at 2549 (citation omitted). For this reason, we find that plaintiff has standing under Section 4 of the Clayton Act to bring its conspiracy and attempted monopolization claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.

## THE CONSPIRACY AND BOYCOTT CLAIMS

■ Defendants contend that even if plaintiff has standing, it has failed properly to allege a conspiracy, a necessary component of a Section 1 claim under the Sherman Act. *See Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 78 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). As defendants read the complaint, plaintiff has alleged only unilateral action on the part of each of the defendants in deciding not to attend Crimpers' trade show. In the absence of a showing of agreement, unilateral action for legitimate business purposes is not a violation of the antitrust laws. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Defendants contend that they are entitled to more than the conclusory language contained in the complaint that HBO and Showtime "conspired to restrain trade."

We find that plaintiff's complaint sets forth more than enough by way of alleged facts to apprise defendants of the claims they face, and from which to infer the possibility of concerted action. Plaintiff sets out quite clearly that the defendants conspired between themselves to restrain trade in the buying and selling of cable television programming and that they attempted to coerce competitors into boycotting Crimpers' trade show. Under these circumstances, we are most reluctant to dismiss the complaint at this stage of the litigation, where there has been no dis-

covery and where motive and intent play so great a role. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Schulman v. Burlington Industries, Inc.*, 255 F.Supp. 847, 850-51 (S.D.N.Y.1966). We cannot say that it appears to a certainty that plaintiff would not be entitled to relief under any set of facts which could be proved in support of its Section 1 conspiracy claim. 2A Moore's Federal Practice ¶ 12.08 (2d ed. 1982).

## THE MONOPOLIZATION CLAIM

■ We also find that plaintiff has stated a valid cause of action for attempted monopolization under Section 2 of the Sherman Act. In order to state a claim for relief under Section 2, plaintiff must allege (1) a " 'dangerous probability of success' in monopolizing a given product market and (2) a specific intent to 'destroy competition or build monopoly.' " *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980) (citing *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir.1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977)).

Defendants contend that plaintiff has failed to define a product market sufficiently to make out a Section 2 claim under the standards set forth in *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) *("Cellophane")*. For purposes of defining a relevant market subject to the restraints on attempted monopolization under Section 2, one looks to commodities that are "reasonably interchangeable" by consumers. *Cellophane*, 351 U.S. at 395, 76 S.Ct. at 1007. Defendants view the commodity that defendants have attempted to monopolize as "movies, sports, and other entertainment" purchased and sold for telecast over cable television networks. *See* n. 1, *supra*. Defendants suggest that this type of programming should be viewed as interchangeable

with programming bought, sold and telecast by the major television networks and, indeed, as interchangeable with the viewing of such programming at local movie theaters or on home video recorders. Viewed from this broad prospective, defendants argue that it cannot be asserted in good faith that either defendant has monopolized or is attempting to monopolize so large a market.

■ We reject defendants' characterization as definitive of the relevant market. The market for the sale of programming for telecast on home television may be rather different than, for example, the market for the sale of programming in the form of movies to local motion picture theaters. Moreover, it is certainly arguable that consumers view the telecast of programming over pay cable television as a distinct commodity from the advertiser-supported programming telecast over the major networks. We find that the market for the purchase and sale of programming by companies like HBO and Showtime for telecast over cable television networks to be at least arguably sufficiently distinct from the purchase and sale of programming for broadcast over the major networks or in movie theaters as to qualify (at this stage of the proceedings) as a market subject to the prohibitions against attempted monopolization under Section 2.

■ While defendants may show at a later stage of the litigation that plaintiff has failed to set forth adequately a relevant market for purposes of Section 2, we cannot say at this early stage that plaintiff has failed to allege a set of facts that could arguably support a Section 2 claim.

We also find plaintiff's allegation that defendants possess sufficient economic power to coerce suppliers and producers into boycotting its trade show, if proved, sufficient to constitute an allegation of a "dangerous probability of success" in monopolizing the market for the buying of cable television programming. And the facts alleged in support of plaintiff's Section 1 claim are more than sufficient to constitute an allegation of intent to monopolize or

restrain competition on defendants' part necessary to satisfy the requirements of a Section 2 claim. We therefore find that plaintiff has stated a claim for attempted monopolization under Section 2 of the Sherman Act, and that plaintiff has standing to sue under this claim. For all the reasons stated above with respect to plaintiff's Section 1 boycott claim, we find plaintiff to lie within the target area of defendants' alleged attempt to monopolize the markets for the sale and purchase of programming for cable television.

## TYING CLAIMS

■ Count III of plaintiff's complaint alleges a tying claim under Section 1 of the Sherman Act and Section 3 of the Clayton Act. Plaintiff alleges that defendants engaged "in the practice of an illegal tie-in and the bundling of programming ..." to create a vertical integration in restraint of trade. Complaint ¶ 33(b). Were defendants to succeed in monopolizing the cable industry through such a tying practice, such success would arguably have the same financial impact on Crimpers in the long run as defendants' alleged boycott and attempted monopolization activities. But long-term adverse impact is not the sole criterion for determining standing. Plaintiff does not directly compete with defendants in the selling of programming to networks and subscribers. Nor does it purchase programming from HBO and Showtime, making it subject to the coercive effects of the alleged tying practice. The injuries for which Crimpers seeks damages are first and foremost a result of the alleged boycott of Crimpers' trade show and relate only indirectly to any alleged tying claim. *See* n. 3, *supra.* More importantly, defendants' alleged tying practice is not targeted at Crimpers with the same degree of specificity as is their alleged boycott of the trade show. As to this claim, Crimpers appears to be on the same footing as any number of other producers and suppliers that might be harmed incidentally by defendants' alleged anticompetitive tying practice. Nothing about defendants' tying scheme, if true,

appears from the complaint to link it in any unique fashion with Crimpers.

In these respects, we find plaintiff's tying claim to be so vague and inarticulately alleged that it is difficult to understand exactly in what respects Crimpers might arguably stand on a different footing than other potential plaintiffs. We also find that Crimpers has failed to allege with sufficient clarity two distinct products—a "tying" product and a "tied" product. *See Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969). Moreover, the tying claim in general is too vague to provide defendants with sufficient notice as to its grounds to enable defendants to prepare a responsive pleading. *See Mountain View Pharmacy v. Abbott Laboratories,* 630 F.2d 1383 (10th Cir.1968). For all these reasons, plaintiff's tying claim is dismissed without prejudice to the filing of an amended complaint within twenty (20) days from the filing of this Opinion alleging with specificity the nature of the alleged tying practice and the basis upon which Crimpers contends that it is affected in such manner as to give it standing.

## STATE CLAIMS

Counts IV–VI of Crimpers' complaint set forth pendent claims under New York law for unfair competition, interference with prospective business advantage, prima facie tort and tortious interference with contractual relations. We find that the complaint adequately alleges tortious interference with contractual relations and prospective business advantage. However, plaintiff has failed to state a claim for unfair competition and prima facie tort. To the extent Counts IV–VI assert these claims, they are dismissed.

■■■■■ The essence of a claim for unfair competition under New York law is that a party misappropriate the skill, expenditures and labor of another. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980); *American Footwear*

*Corp. v. General Footwear Co.,* 609 F.2d 655, 662 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). As we noted above in our discussion of plaintiff's federal claims, *see* n. 3, *supra,* Crimpers does not compete directly with defendants in the markets for the buying and selling of cable programming. There is no claim that defendants misappropriated a property right of the plaintiff for their commercial advantage. *See Flexitized Inc. v. National Flexitized Corp.,* 335 F.2d 774, 782 (2d Cir.1964). Nor is there any claim that defendants are "palming off" their product as one manufactured by the plaintiff or that defendants are in any way attempting to confuse the public as to the identity or ownership of the programming they market. For these reasons, we find that plaintiff has failed to allege any facts upon which plaintiff could base a claim for unfair competition under New York law.

■■■■ We also find that Crimpers has failed to state a claim for prima facie tort. To plead a cause of action for prima facie tort under New York law, plaintiff must show that the defendant inflicted intentional harm, without cause or justification, by an act or series of actions which would otherwise be lawful. *ATI, Inc. v. Ruder & Finn, Inc.,* 42 N.Y.2d 454, 458, 398 N.Y.S.2d 864, 866, 368 N.E.2d 1230, 1232 (1977). Defendant's conduct must have been prompted by a malicious motive unmixed with any other and exclusively directed to injure and damage another. *Korry v. International Telephone & Telegraph Corp.,* 444 F.Supp. 193, 195 (S.D.N.Y.1978). The plaintiff must also plead special damages. *Kalso System-et, Inc. v. Jacobs,* 474 F.Supp. 666, 671 (S.D. N.Y.1979).

■■■■ We note initially that plaintiff has failed to allege special damages with sufficient particularity. Crimpers has claimed general damages of $1,645,000 for lost profits and $19,502,460 for "retarded and impaired financial and technological development." Damage claims of this generality do not constitute an adequate pleading of special damages as required under New

York law. Moreover, plaintiff alleges that defendants refused to attend its trade show in part because they thought it was a fraud and were interested in improving their economic position in the cable industry. These allegations contradict the requirement that defendants' sole motivation in boycotting the show was to injure the plaintiff. Finally, we note that a cause of action in prima facie tort is inappropriate when the facts indicate sufficient grounds for causes of action in "traditional tort" such as wrongful interference with contractual relations. *Susskind v. Ipco Hospital Supply Corp.,* 49 A.D.2d 915, 373 N.Y.S.2d 627 (2d Dept. 1975). We therefore dismiss plaintiff's prima facie tort cause of action.

We find the complaint sufficient with respect to the pleading of the causes of action for interference with prospective business advantage and contractual relations. Crimpers alleges facts that, if proved, could arguably support a showing that contracts for the Catel show would have been entered into were it not for defendants' unfair conduct. *Robbins v. Ogden Corp.,* 490 F.Supp. 801, 811 (S.D.N.Y. 1980). Crimpers' references in ¶¶ 16–18 of its complaint to the number of companies it expected would attend Catel is sufficiently specific to limit the scope of plaintiff's claims, and to provide defendants with notice of the claims against them and an ability to respond and pursue meaningful discovery. While it is true, as defendants point out, that "mere anticipation" of a contract is not sufficient to make out a proper claim for interference with prospective business relations, *see Optivision, Inc. v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 685 (N.D.N.Y.1979), we cannot say at this early point in the proceedings that plaintiff could not prove facts alleged in its complaint that would show a high degree of likelihood that such contracts would have been entered into but for defendants' arguably unlawful actions. And while we recognize that there is no liability for inducing termination of a business relationship before a contract is signed where the defendant's purpose is to advance its own economic self interest, a claim for interference with prospective business relations will lie where the defendant's actions are arguably dishonest, unfair or improper. *Robbins v. Ogden Corp.,* 490 F.Supp. at 811.

For these same reasons, we find that Crimpers has also stated a claim for tortious interference with contractual relations. Defendants' primary problem with the pleading of this cause of action appears to lie with plaintiff's failure to plead more specific information, such as the parties to the alleged contracts for the Catel show, the terms of these contracts, and the nature of their alleged breach. Defendants' Memorandum at 60. These deficiencies do not lend a fatal blow to plaintiff's complaint. We find that the plaintiff adequately sets forth facts from which we could find that valid contracts existed that would have been performed were it not for defendants' intentional actions. *Robbins v. Ogden Corp.,* 490 F.Supp. at 810.

## CONCLUSION

Defendants' motion to dismiss is denied with respect to Counts I and II of the complaint insofar as they state claims for conspiracy in restraint of trade and attempted monopolization under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Defendants' motion is granted with respect to plaintiff's unlawful tying claim with leave to plaintiff to replead this claim within twenty (20) days. Count III of the complaint is hereby dismissed. Insofar as Counts IV–VI of the complaint plead claims for unfair competition and prima facie tort, these claims are dismissed. The motion to dismiss plaintiff's other pendent state claims of tortious interference with contractual relations and prospective business advantage is otherwise denied.

SO ORDERED.