**CRIMPERS PROMOTIONS INC.,**
**Plaintiff-Appellee,**

v.

**HOME BOX OFFICE, INC. and Showtime Entertainment Corporation,**
**Defendants-Appellants.**

**No. 126, Docket 83–7364.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 2, 1983.

Decided Dec. 12, 1983.

Robert D. Joffe, New York City (Cravath, Swaine & Moore, New York City), for defendant-appellant Home Box Office, Inc.

John A. Donovan, New York City (Hughes, Hubbard & Reed, New York City), for defendant-appellant Showtime Entertainment Corporation.

Jerry I. Lefkowitz, Forest Hills, N.Y., for plaintiff-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

The question on this appeal is whether a company organized to hold a trade show to facilitate contacts between producers of cable television programming and local cable television stations has standing to prosecute an action under § 4 of the Clayton Act against two companies which are alleged to dominate the business of purchasing and assembling programming from producers and selling it to the stations. Plaintiff claims that the defendants conspired to cause a boycott of its trade show and to have used their monopoly power to assure the show's failure, in violation of §§ 1 and 2 of the Sherman Act. Judge Sand, in the District Court for the Southern District of New York, answered the question in the affirmative in a well-considered opinion, 554 F.Supp. 838 (1982), but certified his ruling for interlocutory appeal under 28 U.S.C. § 1292(b). We unhesitatingly affirm.

*The Proceedings in the District Court*

The principal allegations of the complaint here relevant are as follows:

Plaintiff Crimpers Promotions Inc. (Crimpers) was formed in 1980 for the initial purpose of producing a cable television trade show known as CATEL–EXPO–PROGRAMMING SOURCES '81 (CATEL) in Las Vegas during September, 1981. CATEL was to be "the first all programming, conference and exposition in the Cable Television Industry and was formed and produced in order to develop a national and international market place [sic] for Cable Television programming of all types and kinds." The show contained space for 350 booths and it was expected that 5000 or more persons would attend.

Defendant Home Box Office, Inc. (HBO) is the most widely available pay-television satellite network in the United States with approximately 8 million subscribers. It purchases programs from independent producers and also creates its own. It sends programs through a satellite to some 3,000 cable system operators affiliated with HBO, who in turn send them to the homes of various subscribers. In addition HBO provides direct services to subscribers in certain areas. Defendant Showtime Entertainment Corporation (Showtime) operates similarly, with some 2.5 million subscribers and 1,300 operators or affiliates.

The complaint goes on to allege that the defendants have become the dominant force in the cable pay-television industry and have unlawfully monopolized the market for programming to the industry.[1] Defendants have been able to offer the cable operators a "bundle" of programs which defendants have acquired from the producers and, being "the most powerful and influential sources through which programming may be sold" in the cable industry, have offered extremely low and unfair prices for programming to the independent companies that sell programming to them. The purpose of CATEL is to bring together in one trade show all suppliers of cable programming, both the independents and the networks, for "a truly comprehensive exposition and conference," with the further goal of creating "a diversity of information sources and access so that Cable System Operators would not be dependent upon the defendants whose vast Satellite Network Services dominate the Pay-TV business in Cable Television."

The complaint further alleges that defendants sent letters and made phone calls to independent programming and system operators to inform them that they should not appear at CATEL. It quoted a representative of defendant Showtime as having told a person who he thought was an independent producer that Showtime would not participate in the show because the company believed it to be a "rip-off"; this was because Showtime considered Crimpers to be an "opportunist" and because Showtime's policy was that it would not sell a particular piece of programming but only programming on a 24-hour a day basis. Defendants had informed independent programming suppliers and system operators that CATEL was a "rip-off" or scam and was a fraud on the public, and that none of the exhibitors would attend. Defendants also threatened that they would no longer purchase programming from those suppliers who attended the show. As a result only 55 companies were exhibitors, only 97 booths were occupied and less than 200 people appeared, in contrast to the 250, 350 and 5,000 that had been expected. As a result defendants had accomplished "their means of driving competitors from the market and of not permitting independent suppliers of

---

**1.** As Judge Sand observed, 554 F.Supp. at 841 n. 2, a claim that the two defendants together attempted to or did monopolize the cable television industry, would be one of oligopoly under § 1 rather than of monopoly under § 2. *American Tel. & Tel. Co. v. Delta Communications Corp.*, 408 F.Supp. 1075, 1106 (S.D.Miss.1976), *aff'd per curiam*, 579 F.2d 972 (5 Cir.1978), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). However, he read the complaint as alleging attempted monopolization by each defendant separately as well as a conspiracy between them to restrain trade. Such a reading seems permissible; if not, any defect could readily be cured by amendment.

stand-alone programming to be solidified into a unit which would attempt to challenge the monopoly created by the defendants." Defendants' illegal acts also forced Crimpers to cease business. The complaint proceeded to make further allegations in support of the claim of monopolization and sought treble damages and injunctive relief. Defendants moved under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint, which also contained counts making a tying claim under § 1 of the Sherman Act and § 3 of the Clayton Act, and various state law claims. The judge denied the motion except for the tying claim and some of the state law claims.

With respect to the claims under §§ 1 and 2 of the Sherman Act, the judge began by explaining that the courts have grafted a doctrine of standing on the sweeping language of § 4 which confers a cause of action upon "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." He noted that this circuit had adopted the so-called "target-area" test, citing *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), and *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir.1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). He said that "[u]nder this test, the plaintiff must either be the 'direct target' of the antitrust violation or fall within the 'target area' of the alleged antitrust violation—that sector of the economy which is endangered by a breakdown of competitive conditions in the particular industry." 554 F.Supp. at 842. He noted defendants' argument that Crimpers did not directly compete with them in buying and selling cable programming; that their activities aimed only at such competitors; and that Crimpers was only incidentally harmed. After canvassing further elaborations of these arguments, the court found the case distinguishable from *Billy Baxter* and *Calderone* because defendants "took 'direct aim' at Crimpers and its trade show." *Id.* at 844.

Judge Sand then stated that whatever doubts he might have had with respect to plaintiff's standing under *Billy Baxter* and *Calderone* were dispelled by the Supreme Court's decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), discussed below, which he viewed as adding "significant gloss to the line of Second Circuit cases interpreting [the target area test's] application, and appears to signal a rather broader reading of the standing requirements under Section 4 of the Clayton Act." 554 F.Supp. at 845. He thought, correctly in our view, that "[a]t a minimum, it now seems clear that, as a rule, a plaintiff need not be a direct competitor in the market in which defendants operate," *id.*, since McCready was a consumer and the defendants were the Blue Shield of Virginia and the Neuropsychiatric Society of Virginia, Inc. Just as the Blue Cross' refusal to honor McCready's bill for treatment by a psychologist was a means to defendants' objective to drive out psychologists in favor of psychiatrists, so the destruction of Crimpers' trade show, which was designed "to keep buyers and sellers of cable programming from transacting business face-to-face," was a means to eliminate competition by producers in dealing with television stations. *Id.* at 846. For these and other reasons discussed in his persuasive opinion, the judge found that Crimpers had standing under § 4 of the Clayton Act to bring its conspiracy and attempted monopolization claims under §§ 1 and 2 of the Sherman Act and denied defendants' motion to dismiss these. However, on motion by the defendants, he certified, under 28 U.S.C. § 1292(b), that his decision involved a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of this litigation, and another panel of this court granted leave to appeal.

### DISCUSSION

Subsequent to the ruling below the Supreme Court handed down another decision under § 4 of the Clayton Act, *Associated*

*General Contractors of California, Inc. v. California State Council of Carpenters, —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), in that instance denying standing. In their briefs to this court, defendants treat *Associated General* as having taken a narrower view of standing than *McCready;* they also repeat the distinctions of *McCready* and their reliance on *Billy Baxter* and *Calderone* which they had unsuccessfully asserted in the district court. We consider that Crimpers' case, rather than being distinguishable from McCready's in a sense favorable to the defendants, is stronger for the plaintiff, and that *Associated General* indicates no departure from *McCready* in any fashion pertinent to this case.

Defendants' battle plan, here as in the district court, is to argue first that plaintiff lacks standing under this court's target area test, and second to contend that *McCready* and *Associated General* endorsed this approach. This is not the proper method of analysis. With two recent elaborate Supreme Court opinions with respect to the scope of § 4 of the Clayton Act on the books, courts in this circuit should start their analysis of standing under § 4 with the Supreme Court opinions rather than engage in extensive parsing of *Billy Baxter* and *Calderone.*[2] The "target area" test embodied in those decisions was adopted over powerful dissents, has proved difficult to apply, and is received tepidly in the leading treatise, 2 Areeda & Turner, Antitrust Law § 334d, at 165–68 (1978). *See also* Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809, 830 (1977) ("The target area approach is riddled with inconsistencies."). While the *McCready* opinion did not disapprove that formulation, it surely did not approve it, see 102 S.Ct. at 2548 n. 14, and the *McCready* result is hard to square with it, since the "targets" in *McCready* were the psychologists, not their patients. The *Associated General* opinion likewise simply cited the "target area" test as one of many, 103 S.Ct.

at 907 n. 33, and, as will be developed later, advised the courts to abstain from black letter rules and to analyze the facts in each case. While we do not hold that *Calderone* or *Billy Baxter* have been drained of their precedential vitality on their own or very similar facts, we think that in approaching new problems, courts of this circuit would do better, indeed are compelled, to follow the approaches adumbrated by the Supreme Court in *McCready* and *Associated General* without concern whether the results are consistent with language in earlier Second Circuit cases.

Justice Brennan's opinion for the Court in *McCready,* after an opening fanfare with respect to the broad scope of § 4 of the Clayton Act, the Court's refusal "to engraft artificial limitations on the § 4 remedy," and its application of the section "in accordance with its plain language and its broad remedial and deterrent objectives," 102 S.Ct. at 2545, recognized that "drawing on statutory policy, our cases have acknowledged two types of limitation on the availability of the § 4 remedy to particular classes of persons and for redress of particular forms of injury," *id.* at 2545–46.

The first of these consisted of limitations, manifested in *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), designed to prevent double recovery. The Court perceived no such danger in *McCready,* where plaintiff's injury in being denied Blue Cross reimbursement was entirely different from the psychologists' loss of patients who did not display her fortitude in obtaining their services without Blue Cross reimbursement. We can see no danger of double recovery in recognizing Crimpers' standing. Crimpers' injury from having its trade show destroyed—the expenses incurred in preparing the show, the loss of reasonably anticipated profits from the show, perhaps even the loss of profits reasonably expected for the future—is dis-

**2.** By the same token, we do not think it useful to discuss the multitude of decisions in other circuits prior to *McCready* and *Associated Gen-* *eral,* none directly in point, which defendants have cited.

tinct and different from the losses of producers in getting too little for their programs or of cable television stations in paying too much.[3] To be sure the case is unlike *McCready* in that the defendants here may have to pay Crimpers as well as the producers and the stations if they were to file suit and ultimately prevail, whereas the *McCready* defendants needed only to pay the plaintiff and her class, the psychologists having suffered no damage since the plaintiffs had continued to use them. But this means simply that if defendants had injured only the producers and the stations, the damages would have been less than if, in the course of their allegedly unlawful conduct, they also injured a company like Crimpers which was endeavoring to facilitate direct dealings between the two. This is not the kind of "double recovery" which *Hawaii* and *Illinois Brick* sought to prevent.

Justice Brennan then turned to the second limitation, which he characterized as the "conceptually more difficult question" whether the injuries were "too remote" from the antitrust violation to afford standing. 102 S.Ct. at 2547. After analogizing the concept of remoteness to the "elusive" notion of proximate cause, he stated that courts should "look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and, (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 2548.

Crimpers easily surmounts the first hurdle. The alleged violations were defendants' conspiring to interpose barriers against direct dealings between the producers and the stations and attempting to monopolize the business of furnishing programs. Crimpers got in the way and defendants allegedly made it suffer for trying to do so.

The second test is likewise satisfied. Defendants concede that their alleged activities were within the concern of Congress insofar as they adversely affected the producers or the stations. We see no reason why Congress, had it considered the matter, would not have been equally concerned with protecting a company like Crimpers which undertook to create a business that would have mitigated the precise injury, the limiting of dealings between producers and television stations to those conducted through HBO and Showtime, against which Congress meant to protect. Crimpers was not just a "supplier" of a competitor, to whom standing is generally denied, see 2 Areeda & Turner, *supra,* § 340(e), at 217. It was endeavoring to forge a link in a chain of the sale of programming, to wit, direct contact between program producers and cable television stations, that would compete with defendants in their role as middlemen. The injury to Crimpers was not a "remote" consequence of defendants' acts as would have been the case, for example, if the low prices allegedly paid by them had put a producer out of business and a supplier of the producer sued under § 4. In such cases the injury to the supplier is simply a consequence of the injury to the producer; Crimpers' case is more like (although stronger than) a boycott of a supplier intended to further the conspirators' restraint of trade and stifling of competition.

Injury to Crimpers was the precisely intended consequence of defendants' boycott; with respect to that act the injury to Crimpers was even more "direct" than to the producers or stations who defendants concede would have standing. Just as McCready's injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," 102 S.Ct. at 2551, so Crimpers' injury was inextricably intertwined with the injury the defendants

---

**3.** While the complaint does not expressly allege the latter, defendants' brief concedes that the stations would have a cause of action under § 4 if defendants had restrained competition by the independent producers in selling directly to them, with attendant "increased distribution costs of purchasing 'packaged' programming from HBO and Showtime instead of buying programming directly from the producers on a 'stand-alone' basis". Brief for Appellants at 24–25. Any defect in alleging this could readily be cured by amendment.

sought to inflict on producers and television stations in the cable television programming market. Under such circumstances, as Justice Brennan explained in *McCready*, *id.* at 2549, the principle of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), does not apply. Indeed, Crimpers' case is not only *a fortiori* to McCready's, since the defendants had Crimpers directly in mind, but *a multo fortiori* to the hypothetical put by Justice Brennan in a footnote:

> If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions. And plainly, in evaluating the reasonableness under the antitrust laws of the psychiatrists' conduct, we would be concerned with its effects not only on the business of banking, but also on the business of the psychologists against whom that secondary boycott was directed.

102 S.Ct. 2551 n. 21.[4]

We see no basis for believing that the position taken in *McCready* was altered in *Associated General, supra,* 103 S.Ct. 897, decided after Judge Sand had rendered his opinion here. All the Justices who concurred in the majority opinion in *McCready* joined in *Associated General* except Justice Marshall, who would have upheld standing in the later case as well. Although Justice Stevens, the writer of *Associated General,* had filed a separate dissent in *McCready,*[5] he quoted from the *McCready* opinion, 103 S.Ct. at 907, followed it in analogizing the quest of federal judges for a workable in-terpretation of § 4 of the Clayton Act to "the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,'" *id.* (footnote omitted), and plainly felt bound by its result, *id.* at 909.

Plaintiffs in *Associated General* were two unions (the Union) representing more than 50,000 individuals employed by the defendants in various phases of the construction business throughout California. The defendants were Associated General Contractors of California, Inc. (Associated), a membership corporation composed of some 250 members, and 1,000 unidentified co-conspirators. The Union and Associated were parties to collective bargaining agreements; some 3,000 contractors who were not members of Associated had entered into separate memorandum agreements binding themselves to the terms of the master collective bargaining agreements. Justice Stevens noted that "[t]he most specific allegations relate to the labor relations between the parties", *id.* at 900 (footnote omitted). He characterized "[t]he complaint's description of actions affecting nonparties" as "both brief and vague," *id.* These included encouraging non-members of Associated to enter into collective bargaining relationships with the Union; encouraging and indeed coercing, see *id.* at 901 n. 3, owners of land and other letters of construction contracts to hire contractors and subcontractors who did not have collective bargaining agreements with plaintiffs; and encouraging and coercing, see *supra,* members and non-members of Associated and memorandum contractors to enter into

---

**4.** This hypothetical also answers defendants' argument, mentioned above, that *McCready* turned on the fact that, because of the willingness of McCready and her class to continue treatment by psychologists without Blue Cross reimbursement, the psychologists suffered no injury—in other words that antitrust defendants stand better where their boycott fails, than where it succeeds. Brief for Appellants at 41–42. Justice Brennan seems to have contemplated that the boycott in the hypothetical succeeded, i.e., the banks ceased making loans to psychologists with consequent injury both to the psychologists from loss of borrowing power and to the bank from loss of their business.

Justice Rehnquist, dissenting, agreed that the bank in the hypothetical had standing, 102 S.Ct. at 2554 n. 7, but predicated this on the impairment of its ability to compete with other banks, a basis which the majority evidently did not find convincing.

**5.** Insofar as the dissent rested on the ground that "[i]f respondent's antitrust claim is that petitioners have engaged in an unlawful boycott, it therefore is manifest that respondent is not the boycottee," 102 S.Ct. at 2556 n. 5, it would be inapplicable here.

agreements with subcontractors who had no collective bargaining agreements with the Union.

Justice Stevens began his discussion by observing that "the Union's most specific claims of injury involve matters that are not subject to review under the antitrust laws," *id.* at 902, and that this was also true with respect to the claim that defendants encourage non-members not to enter into collective bargaining relationships with the Union, *id.* at 903. This left only the allegations that defendants coerced landowners and others who let construction contracts and general contractors to divert business to non-union firms, with consequent loss of business to unionized firms. Recognizing that firms thus losing business might have antitrust claims, the Court then addressed the question whether the Union had such a claim, *id.* at 903–04. After an extensive review of the legislative history of § 7 of the Sherman Act (the predecessor of § 4 of the Clayton Act), the common law decisions antedating it, the early decisions thereunder, and the more recent course of decisions in the Supreme Court and the lower courts, Justice Stevens concluded that "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case," *id.* at 908 (footnote omitted), and adjured lower courts to "analyze each situation in light of the factors set forth in the text *infra*," *id.* n. 33.

Justice Stevens conceded that "[t]he complaint does allege a causal connection between an antitrust violation and harm to the Union and further alleges that the defendants intended to cause that harm," *id.* at 908. However, "[a] number of other factors may be controlling", *id.*, and ulti-

mately were found to dictate dismissal of the Union's claim.

. The first of these was "the nature of the plaintiff's alleged injury." Here Justice Stevens relied on his discussion of the legislative history to support the conclusion that "the Sherman Act was enacted to assure customers the benefit of price competition", *id.*, and went on to state that "our prior cases", including *McCready,* "have emphasized the central interest in protecting the economic freedom of participants in the relevant market," *id.* at 909 (footnote omitted). Whereas McCready was a direct victim of defendants' conspiracy to restrain competition by psychologists with psychiatrists, the Union's harm resulted from defendants' efforts to thwart its objective of excluding non-union labor and this was a "labor-market" rather than an antitrust injury.[6] Here Crimpers claims to be a victim of HBO's and Showtime's conspiracy to prevent direct dealing between producers and television stations by boycotting CATEL.

A second factor against recognition of the Union as a § 4 plaintiff was the indirectness of its injuries, these being only a result of the harm directly inflicted on unionized contractors and subcontractors and their employees, *id.* at 910–11 & nn. 46 and 47. Here, as in *McCready,* plaintiff's injury could hardly have been more "direct." It is true, as defendants argue, that direct dealing between producers and television stations would not necessarily take the form of patronizing Crimpers' trade show. But this would be a question of evidence and the amount of damages, particularly if Crimpers should assert damages for loss of future profits, not a basis for dismissal under Fed.R.Civ.P. 12(b)(6).

A third factor in rejecting the Union's claim was that

> McCready was a consumer, the opinion was not so limited, as witness the bank hypothetical in footnote 21 of the Court's opinion discussed above. Second, Crimpers was "a competitor in the market in which trade was restrained" in the sense that its trade show would have served to facilitate the direct dealing between producers and television stations which defendants sought to prevent.

**6.** Emphasizing a statement made by Justice Stevens in distinguishing *McCready,* "[i]n this case, however, the Union was neither a consumer nor a competitor in the market in which trade was restrained," 103 S.Ct. at 909 (footnote omitted), defendants argue that any enlargement of the category of § 4 plaintiffs wrought by *McCready* was limited to consumers and that Crimpers was not a consumer. There are two answers: First, although

[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general.

103 S.Ct. at 911 (footnote omitted). Conceding that producers or television stations could sue for restraints illegally imposed on dealing between them, defendants urge this as a factor in their favor. Again there are a number of answers. First, Crimpers is not a "remote" party but was the immediate object of defendants' boycott. Second, despite their standing, the producers and stations would be hard put to establish just what damage they had suffered from inability to participate in Crimpers' show. Third, Crimpers *is* the most logical plaintiff to sue for the injury here alleged in the boycott of its trade show—as distinguished from the more general conspiracy to prevent direct dealings between producers and television stations.

A fourth factor militating against the Union's standing in *Associated General* was the speculative character of its damage claim, on which the Court elaborated. *Id.* at 911. As previously developed, Crimpers' damage claim is little more speculative than was McCready's. Its expenses in preparing CATEL are easily determinable, and its expected profits from this and future shows should be proveable under the liberal principles long recognized in antitrust cases. See *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969).

A final factor working against the Union's standing in *Associated General* was the difficulty in disentangling its damages from other damages resulting from defendant's conduct in order to avoid the danger of double recovery. 103 S.Ct. at 911–12.

In our analysis of *McCready* we have demonstrated that no such problem exists here. Defendants argue further that a successful suit by the cable operators would deprive HBO and Showtime of any illegal fruits they might have gained from imposing increased distribution costs whereas Crimpers' damages are totally unrelated to such benefits. This misapprehends the function of a § 4 action which is to recompense a victim for his damages, not simply to strip a violator of his rewards.

In sum, despite the able presentation by defendants' counsel, we are unconvinced that the victim of a successful boycott designed to support a broad policy of market limitation lacks standing under § 4 simply because the boycottee was not a buyer or a seller but was endeavoring to provide a method whereby buyers and sellers could deal effectively with each other without paying tribute to the defendants. The contrary view would run counter not only to the two most recent decisions of the Supreme Court but to elementary common sense. Indeed, if we should free ourselves from the miasma of adjectives that has accumulated around the words of § 4, this case would seem to be a paradigm of standing.

Affirmed.