The BROKERS' ASSISTANT,
INC., Plaintiff,

v.

WILLIAMS REAL ESTATE CO., INC.;
Edward S. Gordon Co., Inc.; Cushman
& Wakefield, Inc.; and Cross & Brown
Co., Defendants.

No. 84 CIV. 1356 (PKL).

United States District Court,
S.D. New York.

Nov. 5, 1986.

Meister Leventhal & Slade, New York City, for plaintiff.

Spengler Carlson Gubar Brodsky & Frischling, New York City, for defendant Williams.

Reavis & McGrath, New York City, for defendant Gordon.

Carb, Luria, Glassner, Cook & Kufeld, New York City, for defendant Cushman & Wakefield, Inc.

Parker Auspitz Neesemann & Delehanty P.C., New York City, for defendant Cross & Brown Co.

LEISURE, District Judge:

Plaintiff, The Brokers' Assistant ("TBA"), a real estate brokerage service firm, brings suit against defendants, Williams Real Estate Co., Inc. ("Williams"), Edward S. Gordon Company, Inc. ("Gordon"), Cushman & Wakefield, Inc. ("Cushman"), and Cross & Brown Co. ("Cross") (hereinafter referred to collectively as "defendants"), allegedly for unlawfully refusing to provide information to TBA, with the intent of putting TBA out of business, as well as limiting competition in the real estate brokerage industry. In this action TBA raises the following three claims: (1)

violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1985 & Supp.1986), (2) violation of the Donnelly Act, N.Y.Gen.Bus.Law § 340 (McKinney 1968), and (3) tortious interference with TBA's business relations with third-parties.

Williams, Cushman, and Cross counterclaim that TBA obtained its listing information improperly and that it engaged in unfair competition. Cross further counterclaims for copyright infringement. Finally, Cushman counterclaims for TBA's alleged violation of Section 443 *et seq.* of the N.Y. Real Prop.Law (McKinney 1968).[1]

At this juncture, TBA has moved for leave to amend its complaint to add a request for punitive damages under its tortious interference claim. Fed.R.Civ.P. 15(a). Defendants have cross-moved for summary judgment and in opposition to TBA's motion for leave to file its amended complaint. TBA has also moved for summary judgment to dismiss defendants' counterclaims.

In order for movants to succeed on their motions for summary judgment, they must meet the difficult burden imposed under Fed.R.Civ.P. 56. The movants must "show that there is no genuine issue as to any material fact" and that they are "entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The nonmovant is "to be given the benefit of all reasonable doubts in determining whether a genuine issue of material fact exists." *Reading Industries, Inc. v. Kennecott Copper Corp.,* 631 F.2d 10, 13 n. 6 (2d Cir.1980), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981) (citation omitted). *See also United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bailey v. Hartford Fire Ins. Co.,* 565 F.2d 826, 830 (2d Cir.1977). "The Court may determine only whether issues of fact exist; it may not pass any judgment on the quality of the proof by trying such factual issues." *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 935 (S.D.N.Y.

---

1. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331 and 1337, and under the principles of pendent jurisdiction.

1983). *Accord Wilson-Rich v. Don Aux Assocs., Inc.*, 524 F.Supp. 1226, 1229 (S.D. N.Y.1981). Moreover, it must draw all reasonable inferences in favor of the party opposing the motion. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

Even though the Court characterizes the burden imposed by Rule 56 as difficult, this does not imply that it is unduly cautious with respect to ruling on motions for summary judgment. The Court recognizes that frivolous litigation can impose high costs on blameless parties. *See United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976). It is also aware of the recent Supreme Court and Second Circuit decisions, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 342, 88 L.Ed.2d 285 (1986); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38 (2d Cir. 1986), which indicate a growing willingness on the part of the federal courts to use summary judgment as an effective tool for expediting litigation. This trend notwithstanding, the Court concludes that, for the reasons set forth below, the instant motions for summary judgment must be denied.

With respect to TBA's motion to amend its complaint, movant's burden is lighter. Rule 15(a) requires courts to grant leave to amend freely "when justice so requires." Consistent with the liberal policy behind this rule, the Court hereby grants TBA's motion for leave to amend its complaint.

## FACTUAL BACKGROUND

Defendants are licensed real estate brokers. They act as leasing agents and brokers of commercial office space in the New York metropolitan area. Defendants do business, in part, by entering into exclusive listing agreements with owners of office buildings. Defendants also represent tenants looking for commercial space. Defendants are paid a commission when one of their exclusive listings is leased or when a tenant they represent leases space.

Brokers need information in order to do business. As TBA notes, "[t]he more information a broker has, and the better he is able to organize and use it, the better he will be able to match tenants with owners and thereby earn commissions."[2] Brokers use various forms of listing services to match prospective tenants with appropriate spaces. The larger brokers, including defendants, maintain and distribute their own listings. Smaller brokers use less sophisticated methods to keep track of available space.

Defendants allege that, in the past, they have only permitted licensed real estate brokers, and certain owners whose property defendants manage, to have access to defendants' listing information. In addition, defendants insist that the brokers' use of the information is restricted to submission to prospective tenants seeking to lease space. TBA also allegedly restricts the use of the information it provides in this manner.

TBA, however, puts these facts in dispute by introducing evidence that "defendants widely disseminate information about their exclusive listings...."[3] TBA charges that "defendants maintain lists of thousands of people to whom they send collections of listings at regular intervals."[4] Moreover, as TBA points out, broad distribution of this information is consistent with defendants' interests because defendants, as agents for building owners, cannot make deals if customers are unaware of available space.[5]

The extent of the distribution of defendants' listing information is a genuine issue

---

**2.** Plaintiff's Memorandum of Law (hereinafter referred to as "P. Memo") at 7.

**3.** *Id.*

**4.** *Id.* Furthermore, TBA notes that no "defendant has any written policy governing who may be placed or retained on its mailing list." *Id.* at 8, n. 20.

**5.** *Id.* at 7.

in dispute. The materiality of this dispute will become more clear upon discussion of the law governing this matter.

TBA is a young company, founded with the purpose of applying computer technology in the field of commercial real estate. Specifically, TBA has sought to develop a service which organizes and makes available to brokers current information regarding the real estate market. However, TBA does not engage in the brokerage business *per se*.

TBA provides its subscribers with access to TBA's data base of real estate listings. According to TBA, this enables the subscriber to "locate all available space of any desired size, at any desired location, and in any desired price range...."[6] TBA contends that its service can benefit all brokers by increasing the amount of usable information available in the market.[7]

Defendants challenge this description of TBA's service. They argue that TBA merely redistributes listings provided by the brokers. TBA responds by pointing out that "it is the formatting, updating and customizing" of information, and not its mere listing, that is valuable to subscribers.[8] Therefore, another genuine issue in dispute is the extent to which TBA does more than just republish lists.

TBA spent considerable time developing its service. It purchased equipment, hired staff[9] and designed computer programs.[10] TBA also surveyed the real estate community to gauge the community's interest in its service. TBA prepared financial predictions and it joined the Real Estate Board of New York. Especially significant in this case, TBA contacted each of the defendants and arranged to be placed on their mailing lists and to receive updates of their exclusive listings from their listings departments. TBA arranged to receive similar listings from hundreds of other brokers.[11]

This juncture marks another considerable point of departure between the parties. Defendants vaguely assert, both as a defense to TBA's claims and as a component of their misappropriation claims, that TBA obtained defendants' listing information improperly. However, the evidence submitted by TBA indicates that defendants were aware of, and consented to, TBA's access to and use of defendants' informa-

---

6. *Id.* at 9.

7. While TBA notes that its "service is of particular value to the middle and small-sized brokers who are unable to obtain and manage so much information themselves, TBA set out to develop a service that would benefit all brokers by increasing the amount of usable information available in the market." *Id.* (citing Affidavit of Steven Gross, sworn to on May 24, 1985, ¶ 3.)

8. P. Memo at 9.

9. TBA employed, before the events precipitating this lawsuit, about twelve people full-time; six of whom worked as account managers obtaining listings. In comparison, Williams employed three people in its listings department, Transcript of Deposition of Harold Wolkoff, undated, at 55; Gordon employed three, Transcript of Deposition of Andrew Fineberg, undated, at 23; Cushman three, Transcript of Deposition of Helena Cuomo, undated, at 17–18; and Cross employed two, Transcript of Deposition, of Thomas Adamo, undated, at 8.

10. TBA claims that its computer programs "retrieved information faster and with more preci-

sion than defendants'." P. Memo at 11. As an example it notes that while TBA's "subscribers could obtain immediate print outs of all space that suited their tenants' needs", Cross could take as long as two hours and their search criteria were not as specific; "Cushman's search criteria were not as specific and its surveys took up to two hours." P. Memo at 11 (citing Transcript of Deposition of Clifford Waldron, undated, at 20–21; Transcript of Deposition of Paul Penney, undated, at 18; Transcript of Deposition, of Helena Cuomo, undated, at 64).

11. Both parties concede that, although TBA receives listings from numerous brokers, access to defendants' information is critical. As Gil Rubinov, the President of Harper-Lawrence, a mid-size brokerage firm, stated:

[The defendants are] the largest brokerage firms in New York. [They] control so much of the prime space in the metropolitan area that the loss of their exclusive listings make The Brokers' Assistant service much less useful. I would not have subscribed initially of The Brokers' Assistant if it did not have these firms' listings.

Affidavit of Gil Rubinov, undated, ¶ 6.

tion.[12] This set of facts is also in dispute, thus rendering summary judgment inappropriate.

In July 1983, TBA began soliciting and selling subscriptions for its services. TBA promoted its business through advertising, telephone, and on-site demonstrations. Within eight months, TBA had enlisted thirty-five subscribers, paying total fees of $21,000 on a monthly basis. Subscribers were enthusiastic about the service. Even non-subscribers appeared to appreciate the benefit TBA conferred upon the real estate market.[13]

During this time TBA obtained and verified, through telephone conversations, more listing information from defendants. The frequency of these telephone conversations ranged from bi-weekly to monthly. However, the length of these telephone conversations and their importance to TBA are issues in dispute.

Michael Cohen ("Cohen"), a Vice-President and member of the Executive Policy Committee of defendant Williams, visited TBA's offices in January 1984. In a conversation with Steven Gross ("Gross"), a Vice-President of TBA, Cohen said he was the son of Jerry Cohen, owner of Williams. It is in dispute whether upon this visit Cohen also said he intended to put TBA out of business. It is undisputed that at this meeting Cohen also told Gross that major brokerage firms, including defendant Williams, would from that time on refuse to provide TBA with listings of available space. Finally, Cohen said that, ten years before, his father had put another listing service out of business.[14]

Subsequent to this conversation, Cohen called the presidents of defendants. Cohen described the substance of the conversa-

tions he had with these individuals in the following way:

[I said that Williams] had just learned about TBA and what it did and the fact that it was apparently obtaining, without the knowledge or consent of officers of Williams, a copy of our list of available space for republication and resale purposes and also listing information from the listing departments of several other large brokerage firms in New York City.[15]

Cohen also stated during these conversations that Williams had stopped providing TBA with the listing information. He asked each person what his firm was doing or would do about the situation.[16]

TBA disputes this version of the conversations Cohen had with the presidents of defendants. TBA does not have direct evidence of these particular conversations. However, TBA does produce evidence of another conversation that Cohen had with an executive at another real estate brokerage firm. Plaintiff contends that this later conversation is a more accurate representation of what actually took place in all the conversations.

Dennis Karr, a Senior Vice President of Jones, Lang Wooton, a non-party competitor of defendants, testified that in a conversation he had with Cohen, "[Cohen] said a group of firms had decided collectively that they were not going to provide their listing information to [TBA]."[17] Karr testified that Cohen said that he had

[c]ome to an agreement or come to a conclusion with several other firms that they would withhold listings information from [TBA]. [Cohen] asked [Karr] to consider that [Jones, Lang Wooton] similarly withhold their—our listings information on our agency buildings from [TBA].[18]

---

**12.** Affidavit of Steven Gross, sworn to on Feb. 23, 1984, ¶ 16–18.

**13.** *Id.* at ¶ 4–6.

**14.** *Id.* at ¶ 7–8.

**15.** Affidavit of Michael Cohen, sworn to on March 6, 1984 (hereinafter referred to as "Cohen Aff."), ¶ 18–19.

**16.** *Id.*

**17.** Transcript of Deposition of Dennis Karr, undated, at 16.

**18.** *Id.* at 10, 16.

TBA alleges that, within a week of Cohen's phone calls, the presidents of defendants promptly instructed their employees to cease doing business with TBA. Defendants' employees could no longer provide information to TBA on the phone. Defendants also removed TBA from their mailing list. When Cohen was later asked by Gross about defendants' simultaneous refusal to do business with TBA, Cohen said he was not claiming that it was a "coincidence." [19]

Another material fact in dispute in this case involves the timing of Williams' and the other defendants' cutting off of TBA. It is undisputed that Williams had already implemented its new policy of severing TBA's information access *before* Cohen's phone calls. TBA charges, in the face of defendants' denials, that defendants immediately cut off TBA after their phone conversations with Cohen.

Cushman responds to TBA's version of the facts by alleging that after Cohen's phone call, it conducted its own investigation of TBA before cutting TBA off. This allegation is in sharp contrast with evidence introduced by TBA to the effect that Cushman cut off TBA while its president was *still on the phone* with Cohen.[20] Cross also claims that it did not sever relations with TBA immediately after Cohen's phone call. Cross alleges that after Cohen's phone call, its Vice-President of Administration was directed to conduct an investigation of TBA. However, in his deposition, the Vice-President denied knowledge of such a directive and admitted that he conducted no investigation.[21] Finally, TBA claims that Gordon's president told Cohen, *on the phone*, that he would "take care of it", presumably meaning TBA.[22]

TBA claims that defendants' actions had a devastating impact on TBA. It is clear to this Court that, without information regarding the space handled by defendants, the value of TBA's service to its subscribers was certainly reduced. TBA's "faucet was turned off;"[23] it was "dead in the water."[24]

The loss of TBA's access to defendants' information has made TBA's service less attractive. The once increasing number of TBA subscribers has leveled off. Subscribers have cancelled or reduced orders. Moreover, customers have warned that the decreased value of TBA's service may cause them to reconsider their subscriptions.[25]

TBA has cut its staff and moved to smaller offices. TBA has curtailed its services and no longer provides listings of retail stores and industrial space. In sum, TBA's business has declined markedly.[26]

## LEGAL DISCUSSION

A. *Section 1 of the Sherman Act*

In order to sustain its claim under Section 1 of the Sherman Act, plaintiff must

---

19. Transcript of telephone conversation between Michael Cohen and Steven Gross, Feb. 1984, at 21.

20. Cohen Aff., ¶ 21.

21. Transcript of Deposition of Thomas Whitley, undated, at 21.

22. Transcript of Deposition of Michael Cohen, undated, at 52.

23. P. Memo at 22.

24. This quote is taken from a statement allegedly made by the president of Gordon. Although Mr. Gordon cannot recall making this statement, Transcript of Deposition Edward Gordon, undated, at 7–8, TBA alleges that three individuals are witnesses to it. Testimony of Steven Gross at 18, Transcript of Hearing on Motion for Preliminary Injunction, March 1984; Transcript of Deposition of Bernard Rabinowicz, undated, at 34; Transcript of Deposition of Abraham Fruchthandler, undated, at 76.

25. *See* P. Memo at 19–22. It is here worth quoting from a letter sent to TBA from one of its subscribers:

> As you are aware, your inability to provide us with the listings from some of the largest [brokerage] firms has had a considerable impact upon the value of your service. Unless this situation is rectified, fairly soon, it will not be in our best interests to remain a subscriber.

Letter from Richard Schlesinger, President of R.B. Schlesinger & Company, to Steven Gross, Vice-President of TBA (May 21, 1985).

26. P. Memo at 19–22.

establish two elements: first, that the defendants entered into a "contract ... combination or conspiracy"; and second, that such agreement was in "restraint of trade or commerce among the several states." 15 U.S.C. § 1; *Monsanto Co. v. Spray-Rite Serve Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

The issue before this Court upon defendants' motion for summary judgment is *not* whether TBA has presented enough evidence to establish its antitrust claim. Rather, the Court only faces the question of whether defendants have satisfied their burden so as to be entitled to summary judgment.

The aforementioned standard governing the granting of summary judgment, *see supra* at 1112–1113, is modified somewhat by the law of antitrust. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 106 S.Ct. at 1357. As the Supreme Court further noted: ·

> conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. [Plaintiff], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiff].

*Id.* (citations omitted).

Of course, "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (citation omitted). A litigant ."must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita, supra,* 106 S.Ct. at 1356 (citations omitted). Moreover, "[w]hen the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *H & B Equipment v. Int'l Harvester Co.*, 577 F.2d 239, 247 (5th Cir.1978) (quoting *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1371 & n. 25 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977)).

Mindful of the above stated principles, this Court finds, for the following reasons, that defendants have failed to meet their burden. Therefore, defendants' motion for summary judgment with respect to TBA's § 1 claim is denied.

### 1. *Contract, Combination or Conspiracy*

Defendants argue that TBA's § 1 claim should be summarily dismissed because the "undisputed evidence shows that each defendant acted unilaterally ..." [27] in severing plaintiff's access to their real estate listings. Defendants assert that TBA, despite extensive discovery, has not and cannot come forward with specific facts from which an inference of agreement among defendants may be drawn.[28] *See Giant Paper & Film Corp. v. Albemarle Paper Co.*, 430 F.Supp. 981, 983–84 (S.D.N.Y. 1977). Defendants argue that TBA "has not even established that the defendants knew what each other were doing, much less that any of them agreed with any other." [29]

Defendants characterize plaintiff's evidence as supporting findings of mere communications among competitors and conscious parallelism. Therefore, defendants argue that as a matter of law, this evidence is insufficient to sustain an inference of conspiracy. *See United States v. Citizens & Southern Nat'l. Bank*, 422 U.S. 86, 113,

---

**27.** Defendants' Joint Memorandum of Law (hereinafter referred to as "D. Memo"), 2.

**28.** *Id.* at 3.

**29.** *Id.* at 25.

95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975); *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). This Court does not dispute defendants' analysis of how the law defines an antitrust violation. However, this Court, as well as TBA, dispute defendants' summary description of the evidence proffered by TBA.

■ Despite defendants' contentions, TBA does provide evidence, which is disputed by defendants, on the material question of whether defendants did in fact collaborate and agree simultaneously to cut off TBA.

TBA first introduces the evidence of Cohen's visit to TBA's office. *See supra* at 1115. Defendants contest whether Cohen actually made the complete statement recounted by Gross. This dispute, in part, is fatal to defendants' motion for summary judgment. Defendants also argue that this "alleged statement ... is too vague and indefinite to supply the basis for an inference of conspiracy...." [30]

As described earlier, TBA also relies on a conversation between Cohen and Mr. Karr with respect to this same material issue. *See supra* at 1115. Defendants attack this testimony as unintelligible,[31] and again charge that the testimony is too vague and indefinite to support a finding of conspiracy. Defendants thus undermine their own motion for summary judgment by appearing to dispute the "reasonable" interpretation of what Karr said, rather than the nature of his testimony. This again suggests that a genuine issue of material fact exists in this case.[32]

Plaintiff next provides evidence showing that defendants—within a week of Mr. Cohen's visit—reversed their year-long practice and simultaneously ceased providing plaintiff with listing information. Later, when asked about this uniform change in policy, Cohen practically admitted that this development was "no coincidence." *See supra* at 1116. Again, the Court finds a genuine issue of material fact as to when defendants actually severed their association with plaintiff.

The Court agrees with defendants that there is no direct evidence explicitly showing agreement among all the defendants. However, a substantial amount of evidence exists from which a court, viewing such evidence in the light most favorable to nonmovant, can infer the existence of a conspiracy. More important, for the purposes of denying defendants' motion for summary judgment, the Court here finds that there are genuine issues of material fact in this case; especially when the Court in so determining must give the benefit of all reasonable doubt to nonmovant. In sum,

---

**30.** Joint Reply Memorandum of Law of Defendants Cushman, Cross and Gordon (hereinafter referred to as "Defs.' Jt. Reply"), 3.

**31.** *Id.* at 4.

**32.** Defendants not only challenge the substantive import of Cohen's and Karr's statements, they also challenge the statements' admissibility. *Id.* at 3–5.

As a threshold matter, both statements are admissible against Williams as admissions and declarations against interest by an officer of a company. Fed.R.Evid. 801(d)(2). The statements are also admissible against all the defendants generally, not for the truth of the matter asserted, but as evidence of the effort Cohen gave to persuade the other defendants. Fed.R. Evid. 801(c).

The defendants, other than Williams, challenge the admissibility of the statements against them if they are offered for the truth of the matter asserted, *i.e.*, that the defendants participated in a conspiracy. The general rule is that statements by an alleged conspirator may not be admitted into evidence against other alleged conspirators unless and until the proponent produces a "fair preponderance" of non-hearsay evidence establishing the other alleged conspirators participation.

Neither party has brought any Second Circuit authority to the Court's attention with respect to whether this is the proper evidentiary standard under a motion for summary judgment. However, the Court does not reach this question because it finds that there is ample independent evidence to constitute the necessary preliminary showing of participation by the other alleged conspirators. This is especially true given a court's limited role in ruling on summary judgment: to search for issues in dispute, not weigh evidence, and to draw all inferences in favor of the nonmovant.

defendants have failed to meet their initial burden.

## 2. Legitimate Business Justifications for Defendants' Policy Change

■ Defendants, aware of the plausibility of TBA's posited conspiracy theory, have provided the Court with a competing theory to explain defendants' actions. Defendants argue that their behavior is merely the aggregate of each defendant's parallel but independent decisions dictated by each defendant's own legitimate business determinations. Defendants urge this Court to find that TBA's conspiracy theory does not tend " 'to exclude the possibility' that the alleged conspirators acted independently." *Matsushita, supra,* 106 S.Ct. at 1357 (quoting *Monsanto, supra,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

Defendants argue that each defendant's actions or policies towards TBA were consistent with each defendant's preexisting policy governing distribution of listings.[33] In support, defendants cite Judge Ward's finding that "[o]ver the years defendants have restricted the distribution of their listings to licensed real estate brokers and certain owners whose property defendants manage." [34] This history of prior business practice indicates that, even prior to the existence of TBA, defendants had legitimate business reasons for restricting the use of their listings.

Defendants also allege that each individual defendant developed its real estate listings at its own considerable expense. Defendants argue that each defendant's individual refusal to allow TBA to receive its respective listings is, therefore, a legitimate business act designed to protect each defendant's own proprietary information.[35] *See Modern Home Inst., Inc. v. Hartford Accident & Indem. Co.,* 513 F.2d 102 (2d Cir.1975).

Defendants further argue that each defendant's refusal to deal with TBA was motivated by its concern with the style and accuracy of TBA's presentation of each defendant's listing information.[36] Defendants also offer as a legitimate business reason for ending relations with TBA, the time and expense spent providing such in-

---

**33.** D. Memo at 3.

**34.** *Id.* at 9. Defendants rely heavily throughout their papers on Judge Ward's opinion denying TBA's petition for preliminary injunctive relief. The standard for deciding a motion for a preliminary injunction is patently different, however, from the standard applied in deciding a motion for summary judgment.

In order to be granted preliminary relief the moving party must show irreparable injury. It is also incumbent on the defendant to show either probable success on the merits or sufficiently serious questions going to the merits and, a balance of hardships decidedly in its favor. *See, e.g., Jack Kahn Music v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir. 1979). In denying TBA's motion, Judge Ward found that TBA had not met this burden; however, this does not satisfy defendants' burden before the Court on the instant motion for summary judgment. In addition to a different standard, the court ruling on a motion for preliminary relief must examine the evidence and issues at a much earlier stage in the case's development. Judge Ward ruled before any substantial discovery had proceeded; subsequently, substantial facts have been developed by TBA. *See* P. Memo at 58–60.

As Professor Moore notes, "findings [of a preliminary injunction motion] cannot be used to ground a motion for summary judgment when they resolve contested issues of fact." 7 J. Moore, *Federal Practice,* ¶ 65.04[5], at 65–70 (1986) Preliminary injunction decisions rule on "only the probability of success of the merits rather than the merits themselves." *Jones v. New York City Human Resources Admin.,* 391 F.Supp. 1064, 1068 n. 3 (S.D.N.Y.1975), *aff'd,* 528 F.2d 696 (2d Cir.), *cert. denied,* 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976). In sum, the granting of summary judgment should not be premised on the determination of a preliminary injunction motion. *See S.E.C. v. North American R & D Corp.,* 59 F.R.D. 111, 113 (S.D.N.Y. 1972).

**35.** D. Memo at 15.

**36.** For example, defendants introduced evidence at the hearing pursuant to TBA's motion for preliminary injunction that:

Mr. Gordon, the President of defendant Gordon ... wanted to protect the manner in which the listing information is presented. He found plaintiff's presentation "sloppy" and hard to understand.

*Id.* at 19.

formation to TBA.[37] Defendants final business justification for instituting their new policies allegedly stems from each defendant's desire to prevent plaintiff from "free riding" on each defendant's listings.[38]

According to defendants, the presence of logical and proper business reasons for terminating the flow of information to TBA, which arose solely from each defendant's individual self-interest, raises so strongly an inference of independent activity that no inference of conspiracy is reasonable. *See Matsushita, supra,* 106 S.Ct. at 1357.

To add legal backbone to their factual analysis, defendants primarily rely on *Modern Home Instit., supra,* 513 F.2d, at 102, in which the court held that, absent evidence of an illegal agreement, a court may look to the defendant's possible motives to determine whether his activities were driven by an illegal agreement. However, *Modern Home Instit.* is inapposite, because, in that case it is undisputed that each of the defendants took the same course of action without consulting each other. Furthermore, the plaintiffs in *Modern Home Instit.* introduced no direct evidence of a conspiracy or even any communication among the defendants.

There is no doubt that *Modern Home Instit.* establishes the proper standard for a conscious parallelism case. Here, however, TBA has offered evidence, both direct and circumstantial, bearing on the material issue of whether an agreement existed among the defendants, and the nature of the conduct by which that agreement was executed and implemented.

Finally, defendants again attempt to derive legal support from a case with facts less than apposite to those at bar. *Oreck v. Whirlpool Corp.,* 639 F.2d 75 (2d Cir. 1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). In *Oreck, supra,* 639 F.2d, the Court held that:

> A mere showing of close relations or frequent meetings between the alleged conspirators [to violate antitrust laws] will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.

*Id.* at 79 (citations omitted). Neither TBA nor this Court dispute the validity of this holding. However, in *Oreck,* plaintiff merely established that one defendant was an important customer with close ties to the other defendant. There was little evidence, either direct or circumstantial, that one defendant actually exercised any influence over, or sought any agreement with the other defendant regarding plaintiff's business. Thus, the Court finds *Oreck* readily distinguishable.

Not surprisingly, TBA's view of defendants' legitimate business reason theory is critical. TBA calls business reasons offered by defendant a "smorgasboard of excuses, rationalizations and cover-

---

**37.** *Id.* at 20.

**38.** *Id.* This Court is sympathetic to defendants' free riding argument. The Supreme Court has held that business firms have a right to protect their investments from free riders. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 493, 94 S.Ct. 1879, 1892, 40 L.Ed.2d 315 (1974). Protection against free riding is clearly not anticompetitive. *See Continental T.V. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Defendants also properly point out that "[o]thers are free, by expending comparable resources to develop sophisticated listing systems." Defs.' Jt. Reply at 7.

As discussed more extensively in the body of the opinion, defendants' free rider argument fails to persuade the Court for two reasons. First, the Court's inference of conspiracy and joint activity among the defendants makes it less likely that the free rider problem was really uppermost in the minds of defendants' executives when they acted simultaneously to cut off TBA. Second, the Court accepts, to some extent, plaintiff's argument that TBA does more than free ride on defendants' information. TBA does not just "sell or treat as proprietary what defendants provide for free.... TBA sells a service ... *that enables subscribers to locate information."* P. Memo at 44 (emphasis supplied). At this preliminary stage, based on the papers before it, the Court could very well find that TBA's formatting and retrieval services, as well as its own interstitial investigative efforts, generates information; and that TBA does not merely free ride on defendants.

ups...." [39] TBA charges that "[e]veryone of them ... [raises] a question of fact." [40]

TBA first disputes defendants' contention that they provided information to TBA for an entire year because, in part, they were mistaken about TBA's business. The truth of this contention is not presently at issue. Rather, the issue turns on plaintiff's ability to dispute this material fact beyond mere conclusory allegations. The Court finds that TBA can, and does.

TBA offers evidence that Cushman, Gordon, Williams and Cross were all aware of the nature of TBA's business prior to Cohen's call.[41] TBA further points out that it was "in the business of promoting its service not keeping it a secret".[42] To that end TBA

> issued press releases, conducted surveys, placed advertisements in newspapers and trade journals, joined the Real Estate Board, circulated promotional brochures, gave demonstrations and receptions for brokers (including defendants) and canvassed potential customers.[43]

In sum, TBA presents sufficient evidence to put the issue of defendants' awareness of the nature of TBA's business in genuine dispute.

TBA also disputes defendants' claim that they ceased doing business with TBA because they feared loss of control over their information. TBA convincingly argues that

> [Defendants] provide the information to thousands of other people, including each other. Each defendant takes the information it receives freely from the others and does with it, without objection, pre-

cisely what defendants now object to [TBA's] doing: they compile it, update it, reformat it, reorganize it, mix it with other listings and make it available to others for their use.[44]

With respect to defendants' concern that plaintiff's transmission of inaccurate information could damage defendants, TBA acknowledges this possibility but points out that

1. the possibility of error in transmission of information is no different if it is transmitted by plaintiff or by a codefendant; and

2. not one of defendants' officers or employees who testified could point to one instance of plaintiff's inaccuracy or misuse of information.[45]

Defendants have admitted that they were unaware of any complaints regarding TBA supplying inaccurate information. Defendants provide no evidence that TBA provided information to non-brokers or that TBA disseminated information in any improper manner. Therefore, the utility of this argument is limited in light of defendants' overall argument of legitimate business reasons for their actions.

Finally, TBA contests defendants' argument that each defendant cut off TBA because TBA's information-gathering activities wasted too much of each defendant's time. First, TBA points out that defendants already provide listing updates to each other. More persuasively, TBA states that no officer or employee of any defendant, with only one exception, ever questioned the time required to speak with TBA.[46]

**39.** *Id.* at 22.

**40.** *Id.*

**41.** *See generally,* affidavit of Steven Gross, sworn to on May 24, 1985, ¶¶ 16–18; *see also* Transcript of Deposition of Arthur Mirante, undated, at 18, 28; Transcript of Deposition, Helena Cuomo, undated, at 58–59, 35; Transcript of Deposition, Paul Penney, undated, at 13, 41; Transcript of Deposition, Patricia Rindzuner, undated, at 9; Transcript of Deposition, Andrew Fineberg, undated, at 57–58, 48; Transcript of Deposition, Edwin Roos, undated, at 14–15, 23–24.

**42.** P. Memo at 36.

**43.** *Id.* at 36–37.

**44.** P. Memo at 37.

**45.** P. Memo at 38. *See also* Transcript of Deposition of Marvin Chudnoff, undated, at 72–73; Transcript of Deposition of Jerome Cohen, undated, at 135; Transcript of Deposition of Helena Cuomo, undated, at 52–53; Transcript of Deposition of Andrew Fineberg, undated, at 63; Transcript of Deposition of Arthur Mirante, undated, at 35–36, 47.

**46.** *Id.* at 39.

The exception, defendant Cushman, asked TBA, before Cohen's call, to obtain its updates in a different fashion. Thereafter, according to the proof introduced by TBA, plaintiff's calls to Cushman averaged 10 to 15 minutes every two weeks. Cushman never again questioned TBA or any of its employees on this matter.[47]

### 3. Anticompetitive Motive

■ TBA not only introduces evidence which tends to exclude the possibility that the alleged co-conspirators acted independently, it also provides facts raising an inference that defendants had an anticompetitive motive for cutting off TBA.

TBA produces evidence of a memorandum of defendant Cross stating that its relationship with plaintiff must be ended because TBA provided assistance to defendants' competitors.[48] An employee of Cushman told plaintiff that TBA "interfered with Cushman's competitive edge."[49] Michael Cohen, an executive with Williams, even provided plaintiff with the economic rationale conceivably underlying all of the defendants' fears; Cohen told TBA that it provided smaller brokers with the opportunity to "buy into a listing department almost as sophisticated as our own, and that's an alternative that we rather [they do not] have...."[50] To confirm this point, TBA introduces evidence that defendant Edward Gordon testified that he wanted TBA out of business because he did not want independent brokers to have access to an inexpensive scheme that would help them compete with his company.[51]

This evidence raises an inference of anticompetitive motive for defendants' actions. Defendants argue that in raising this question, TBA is confusing two very different concepts—anticompetitor and anticompetitive.[52] Defendant is correct that the

courts, in interpreting antitrust law, have noted that the law exists only to protect competition and not to protect competitors. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Defendant is also accurate when it points out that independently refusing "to provide free assistance to a competitor (whether directly or indirectly through TBA)" is not an antitrust violation.[53]

In evaluating these statements by defendants however, it is important to remember that TBA has not only raised an inference regarding defendants' motives to conspire, but also introduced evidence supportive of an inference that defendants actually conspired and agreed to simultaneously sever relations with plaintiff. Therefore, while this Court agrees with defendants' explanation of the line between anticompetitor and anticompetitive conduct, it does not agree with defendants' conclusion as to which side of that line defendants' behavior falls.

The inference of anticompetitive motives on the part of defendants can be bolstered by engaging in some basic economic reasoning. If TBA's service survived absent any one defendant's listings in its data base, but with the listings of all remaining defendants, including the withdrawing individual defendant's rivals, the withdrawing defendant would be damaged. Information regarding its competitors' space would receive wider distribution than information about its own space. Therefore, getting all the defendants to join the boycott was essential for any one defendant to succeed in suffocating TBA.

In sum, although defendants put forward evidence from which this Court can draw an inference that the alleged conspirators

---

47. Transcript of Deposition of Helena Cuomo, undated, at 59–60.

48. Memorandum of Richard Seeler to Cross & Brown Listings Department, January 26, 1984.

49. Transcript of Deposition of Arthur Mirante, undated, at 76.

50. Teleph. Transcr., *supra,* note 19, at 11.

51. Transcript of Deposition of Edward Gordon, undated, at 8.

52. Defs.' Jt. Reply at 7.

53. *Id.*

acted independently, the plaintiff presents evidence that tends to exclude this possibility. As the foregoing analysis demonstrates, it is reasonable for the Court to draw an inference of conspiracy among the defendants.

### 4. *Defendants' Actions Caused Cognizable Injury to TBA*

██ In addition to establishing the first element in its § 1 claim, TBA must demonstrate either some factual dispute, or clearly establish that defendants' actions have caused it harm in order to avoid disposition by summary judgment.

This Court need not restate the evidence of harm allegedly suffered by TBA due to defendants' actions. Briefly stated, TBA's business is information—the most important being new information regarding new space, changes in the amount of space offered, changes in price, and changes in rental terms. Without the information provided by defendants, who represent the largest and most significant brokers in the New York real estate market, TBA's service is less valuable. As a result, TBA has lost customers and been unable to attract new customers. Such a loss of business constitutes cognizable injury. Under the standards described earlier in this case, the Court can infer that plaintiff has been injured as a result of the collusion implied by plaintiff's evidence.

### 5. *Standing*

██ Defendants argue that even if this Court refuses to grant defendants' motion for summary judgment on the Sherman Act claim, (because there are genuine issues of dispute in this case or because as a matter of law TBA can prevail) this Court should still grant defendants' motion because TBA is not a proper party to bring this § 1 claim.

To sue under § 1 of the Sherman Act, plaintiff must meet the requirements of § 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws" shall have a cause of action for treble damages. 15 U.S.C. § 15(a).

When deciding standing questions in the antitrust area, "courts of [the Second Circuit] ... are compelled to follow the approaches adumbrated by the Supreme Court in [*Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)] and [*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)] without concern whether the results are consistent with language in earlier Second Circuit cases." *Crimpers Promotions v. Home Box Office, Inc.*, 724 F.2d 290, 293 (2d Cir.1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).

*McCready* opens with a general statement by Justice Brennan describing Congress' purpose in enacting § 4. Justice Brennan interpreted the "lack of restrictive language" as reflecting Congress' "expansive remedial purpose" in enacting § 4. Consistent with this purpose, the Supreme Court has "refused to engraft artificial limitations on the § 4 remedy." *McCready, supra* 457 U.S. at 472, 102 S.Ct. at 2544 (citations omitted). Justice Brennan points out, however, that the opinions of the Supreme Court have "acknowledged two types of limitations on the availability of the § 4 remedy to particular classes of persons and for redress of particular forms of injury." *Id.* at 473, 402 S.Ct. at 2545.

The first limitation, derived from *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), is designed to prevent double recovery. Granting TBA standing does not raise this spectre. TBA's injury caused by defendants' refusal to deal is "distinct and different", *Crimpers, supra*, 724 F.2d at 293–94, from the losses of the smaller brokers, who, unable to afford their own listing departments, will now be unable to compete effectively with the larger brokers.

To be sure, the instant case is unlike *McCready*.[54] Defendants at bar may have to pay the smaller brokers, if they were to file suits and ultimately prevail, as well as TBA. In *McCready*, defendants only had to pay one set of plaintiffs. "This is not the kind of 'double recovery' which *Hawaii* and *Illinois Brick* sought to prevent." *Crimpers, supra,* 724 F.2d at 294.

The second, and "conceptually more difficult" limitation is whether the injuries are *"too remote"* from the antitrust violation to afford standing. *McCready, supra,* 457 U.S. at 476, 102 S.Ct. at 2546 (emphasis in the original). Justice Brennan analogizes the concept of remoteness to the notion of proximate cause. To assess the degree of remoteness the court should:

> look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

*Id.* at 478, 102 S.Ct. at 2547.

TBA satisfies the first standard of this two fold test by producing evidence which supports a reasonable inference that defendants conspired to directly harm TBA by simultaneously agreeing to cut it off. TBA has also provided evidence which supports a reasonable inference that defendants' actions have directly caused harm to plaintiff.

TBA also surmounts the second hurdle. Congress would most likely be concerned with ensuring unfettered competition in the real estate brokerage market. Protecting a company like TBA, which would likely promote competition in the market, would certainly be within the scope of Congressional interest.

"[TBA is] not just a 'supplier' of a competitor to whom standing is generally denied." *Crimpers, supra,* 724 F.2d at 294.

Rather, TBA's service is an attempt to enable smaller brokers, who cannot afford to operate their own listing departments, to compete more effectively with large brokers. The injury to TBA is not a remote consequence of defendants' actions. TBA's case is more like the "boycott of a supplier intended to further 'the conspirators' restraint of trade and stifling of competition." *Id.*

The intended consequence of defendants' acts was to injure TBA. Just as McCready's injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market[,]" *McCready, supra,* 457 U.S. at 484, 102 S.Ct. at 2551, so TBA's injury is inextricably intertwined with the injury defendants have sought to inflict on smaller brokers and the market for commercial office space in general.

Defendants also argue that TBA lacks standing under the test fashioned in *Associated General, supra,* 459 U.S. at 519, 103 S.Ct. at 897, because there are other plaintiffs who have been harmed more directly by defendants' antitrust violations than TBA. Defendants are correct in noting that the directness of injury is one factor to be considered under *Associated General.* The finding of merely one factor does not, however, dictate a finding that TBA lacks standing to bring this lawsuit. TBA was the immediate object of defendants' refusal to deal. As plaintiff notes:

> TBA can more easily establish the injuries it has suffered from the boycott than can small brokers, who despite their status as competitors of defendants, were not the immediate victims of the boycott. And TBA is certainly the most logical plaintiff to sue for injuries resulting from the boycott of its own business.[55]

The Court, therefore, is unconvinced that the "victim of [an allegedly] successful boycott designed to support a broad policy of market limitation lacks standing under § 4.... The contrary view would run

---

**54.** In this respect this case is quite analogous to *Crimpers, supra,* 724 F.2d 290.

**55.** P. Memo at 49.

counter not only to [*McCready* and *Associated General*] but to elementary common sense." *Crimpers, supra,* at 724 F.2d at 297. Therefore, defendants' motion for summary judgment on TBA's antitrust claim on the basis of standing is denied.[56]

### B. *Claim of Tortious Interference with Business Relations*

Defendant also moves for summary judgment with respect to TBA's third claim, that defendants tortiously and unlawfully interfered with plaintiff's business relations with third party customers and prospective customers.[57] In making this part of its motion for summary judgment, defendant argues that TBA's complaint does not state the allegations necessary to support the claim.

In making this first argument, defendants rely primarily on plaintiff's failure to allege that it would have completed a contract with a prospective customer but for defendants' interference. In support of this argument, defendants cite *Williams v. Collins, Tuttle & Co.,* 6 A.D.2d 302, 176 N.Y.S.2d 99 (1st Dep't 1958), where the court stated that:

> [w]here liability is to be imposed for preventing one from making a particular contract, the courts have required more than a showing of qualified probability that the contract would have been completed but for the tortious interference. As a consequence plaintiff must allege at least that "it would have received" the contract.... The "would have received the contract" test is a stringent one. It involves a higher standard of proof than what lawyers call mere probabilities.... It is even a more stringent test than

"reasonably certain" or "reasonable expectation...."

*Id.* 176 N.Y.S.2d at 103–104. Defendant also relies on *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 78 (S.D.N.Y.1978) for the same proposition.

TBA, however, successfully counters defendants' argument. TBA points out that although *Williams* and *Special Event* establish the proper standard for claims of tortious interference with contract, TBA's claim is broader. TBA does not allege that it was damaged solely by a breach of, or failure to conclude, a particular contract. Rather, TBA pleads the broader tort of interference with business relations.

Plaintiff's claim alleges wrongful conduct on the part of defendants that caused harm to TBA's business. In *Martin Ice Cream, supra,* 554 F.Supp. at 945, the court explains that the elements of this cause of action consist of:

> the defendants' interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are "dishonest, unfair or in any other way improper."

(quoting *Robbins v. Ogden Corp.,* 490 F.Supp. 801, 810 (S.D.N.Y.1980) (emphasis in the original); *see also, Paul v. Premier Elec. Constr. Co.,* 576 F.Supp. 384, 389–90 (S.D.N.Y.1983); *Rosenberg v. Del-Mar Div., Champion Int'l Co.,* 56 A.D.2d 576, 391 N.Y.S.2d 452 (2d Dep't 1977). Defendant fails to address TBA's claim under this standard.

---

**56.** Defendants' motion for summary judgment on TBA's second claim, based on the Donnelly Act, New York Gen.Bus.Law § 340 is also denied. Essentially, the Donnelly Act is a state prohibition of contracts or agreements for monopoly or in restraint of trade. Defendants basically concede that if this Court declines to grant summary judgment on the Sherman Act claim, it should also deny the motion for summary judgment with respect to the Donnelly claim. This concession can be inferred from defendant's failure to advance any argument with respect to the merits of the Donnelly claim

other than it should be dismissed for the same reasons presented in defendants' discussion of the Sherman Act claim.

The only extensive discussion in defendant's papers regarding the Donnelly Act revolves around the law of pendent jurisdiction. However, because the Court has declined to grant defendants' motion for summary judgment on plaintiff's federal claim, the Court does not have to reach this jurisdictional question.

**57.** Proposed Amended Complaint, ¶ 43.

This Court finds, however, that even if defendants met TBA's claim under the proper standard, TBA would still prevail. Plaintiff's complaint describes the nature of its business and its dependence on information. TBA alleges that defendants intended to injure TBA and describes in what manner they did so. Finally, plaintiff describes the impact of defendants' actions on its ability to do business.

Moreover, TBA's anti-trust claim, joined with its claim of tortious interference, satisfies the second branch of the *Martin* test. As that Court stated:

> It is beyond dispute that a conspiracy to unreasonably restrain trade or to monopolize trade would constitute improper means. Thus, if [plaintiff] is able to prove the anti-trust violations discussed earlier, it will also be able to prove improper means.

554 F.Supp. at 946.

▮ Not only does TBA properly allege its claim of tortious interference, it also demonstrates that there are material facts in dispute regarding this claim. TBA described defendants' alleged joint decision to boycott TBA, and further claimed that it was hurt by defendants' refusal to deal. Therefore, the Court finds that TBA adequately stated its claim of tortious interference. The Court also holds that TBA has introduced evidence presenting genuine issues of fact material to this claim. Accordingly, defendants' motion for summary judgment on TBA's third claim of relief is also denied.

## C. Misappropriation, Unfair Competition, Copyright Infringement

▮ Three of the defendants—Williams, Cushman, and Cross—bring counterclaims against TBA for misappropriation, unfair competition, and copyright infringment.[58]

These counterclaims are before the Court on TBA's motion for summary judgment. The Court hereby denies plaintiff's motion for summary judgment because there are material facts in dispute.

The three counterclaims all stem from the same basic allegation: that TBA obtained its listing information improperly. This allegation is also a crucial component of defendants' legitimate business rationale theory. Not surprisingly, the same material facts that were in dispute there are also in conflict here.

Both plaintiff and defendants argue that the "uncontradicted evidence" supports their position.[59] The Court declines to describe in detail the facts here in conflict. Instead, it simply notes that TBA allegedly obtained its information from defendants "openly, properly, and with defendants' knowledge and consent, that the information is not secret or proprietary, and that TBA did not misuse the information or put it to any improper use."[60]

Defendants, on the other hand, argue that:

> If there is anything undisputed in this case, it must be the fact that defendants do *not* approve of such activities by TBA, and that any access granted in the past at whatever level has been revoked.[61]

Defendants characterize plaintiff's evidence as merely showing that plaintiff gained access through dealings with lower level employees; and that plaintiff's evidence cannot show that defendants' senior management approved TBA's access to their listings.

In sum, as this Court noted previously, there are facts in dispute regarding the material issue of whether plaintiff properly gained access to defendants' information,

---

**58.** The Court presumes Cushman's counterclaim under Article 12–B, of the New York Real Property Law, is abandoned because it is not mentioned in defendants' papers. However, even if this counterclaim were not abandoned, the Court would be inclined to grant TBA's motion for summary judgment with respect to it.

**59.** P. Memo at 63; Defs.' Jt. Reply at 18.

**60.** Plaintiff introduces evidence that it followed proper channels in obtaining access to defendants information. *See generally,* P. Memo at 63.

**61.** Defs.' Jt. Reply at 18–19.

and whether defendants were aware of such access by TBA. Accordingly, TBA's motion for summary judgment on the counterclaims brought by three of the defendants is denied.

### D. *TBA's Motion to Amend Its Complaint*

 TBA also seeks to amend its complaint pursuant to Fed.R.Civ.P. 15(a), to add a request for punitive damages with respect to their claim of unlawful and tortious interference. Rule 15(a) requires courts to grant leave to amend freely "when justice so requires."

The Supreme Court in elaborating upon the sparse language of the rule, stated that:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, *futility of amendment* etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court....

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (emphasis supplied).

Defendants challenge plaintiff's proposed modification of its complaint on the ground that such amendment is futile. This argument is based upon defendants' earlier assertion that plaintiff's entire claim of tortious interference is futile. As has been shown, the Court disagrees with defendants' assessments of the merits of TBA's third claim. The limitations outlined by the Supreme Court in *Foman* do not apply here.

Permitting TBA to amend its complaint is consistent with the liberal policy behind Rule 15(a). TBA should have the opportunity to present its claim on the merits. Accordingly, TBA's motion for leave to amend its complaint is granted.

### CONCLUSION

For the above stated reasons, the Court denies defendants' motion for summary judgment. The Court also declines to grant plaintiff's motion for summary judgment. However, plaintiff's motion for leave to amend its complaint is granted.

SO ORDERED.